**UNITED STATES of America**

v.

**Derek YOUNG, Charles Lark.**

**Crim. A. No. 72–549.**

United States District Court,
E. D. Pennsylvania.

Feb. 2, 1973.

Carmen Nasuti, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Michael Baylson, Max Meshon, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

In a four-count indictment the defendant, Henry Derek Young, was charged by the Grand Jury on October 4, 1972 with violations of 18 U.S.C. § 2113(a), (b) and (d). Defendant has moved to suppress a statement given by him to agents of the Federal Bureau of Investigation (FBI) on October 3, 1972. The statement admits defendant's guilt in robbing the Penn Federal Savings and Loan Association (PFS&LA) on October 3, 1972. Five grounds are offered in support of the motion to suppress: (1) defendant was arrested without probable cause and the subsequent interrogation was the fruit of this unlawful arrest, (2) he did not have the requisite mental capacity to understand the warnings of constitutional rights as may have been given to him, and therefore could not have intelligently and knowingly waived those rights, (3) he was a drug addict and was entitled to medical treatment or attention before the government can prove that it met the burden of showing a waiver of constitutional rights, (4) the constitutional rights given to him by the FBI agents were insufficient, and (5) Rule 5, Federal Rules of Criminal Procedure, was violated by interrogation unnecessarily lengthened by questioning defendant about crimes unrelated to the specific crime which led to his arrest on October 3, 1972. A hearing on the motion to suppress was held on January 8 and continued to January 15, 1973. On the government's motion, a further hearing was held on January 30, 1973. At the hearing the government called seven witnesses, the two members of the Philadelphia Police Department who apprehended the defendant, the three FBI agents who interrogated the defendant, a United States Marshal who took the defendant's photograph and personal history the day after defendant's arrest, and a clinical psychologist, Mr. Albert Levitt. The defense called Dr. Kenneth J. Barber, Jr., a clinical psychologist.

The testimony of the two Philadelphia police officers, Lawrence DeJarnette and Alton Smith, was substantially the same. Both officers were "staked out" in plain clothes and on foot at the back of the Mid-City Federal Bank at 1607 Walnut Street, Philadelphia on October 3, 1972. They received a radio call at approximately 2:25 P.M. that a bank at 1627 Walnut Street (PFS&LA) had been robbed. The radio message did not give a description of the person who had reportedly robbed the bank at 1627 Walnut Street. It took the officers about thirty (30) seconds to walk to the front of the Mid-City Federal Bank at which time they saw the defendant running (or trotting as Smith testified) from the area in front of PFS&LA across Walnut Street, in an easterly direction from the North to the South side of the street. There was very little traffic or people on the street at the time. DeJarnette stated that he first saw the defendant halfway across Walnut; Smith stated he first saw the defendant three (3) feet in front of PFS&LA. Smith was in front of DeJarnette when they came out of Mid-City Federal. Both officers testified that the defendant was

looking back as he ran across Walnut. The defendant went behind a truck parked at 1608 Walnut. It was there that he was arrested.

The defendant stopped behind the truck. DeJarnette took from the defendant a folded copy of a newspaper the defendant had been carrying. A .32 caliber revolver with three spent cartridges and two live shells was in the paper. It is not clear whether DeJarnette saw the revolver when he took the newspaper from the defendant. We, however, credit his testimony that he believed from the feel of the item in the newspaper that it contained a weapon. DeJarnette frisked the defendant; he felt bulges in defendant's pockets but did not conduct a more thorough search at that time. He thought the bulges were caused by paper. The officers took the defendant back to the bank where he was positively identified by the teller who had just been robbed. The officers then conducted a more thorough search and found three thousand six hundred and fifty-six dollars ($3,656) in defendant's pockets. Defendant was then taken to the Central Detective Division (CDD) of the Philadelphia Police Department. Both officers stated that the defendant looked physically normal when arrested; defendant was not upset or nauseous; he had no cold sweats; and there were no fluids running from his eyes or nose.

The next witness, FBI agent Kelly, arrived with FBI agent Fields at the CDD at approximately 3 P.M. The defendant was in a room by himself apparently handcuffed to a bench. The agents identified themselves, and told the defendant of the charge against him. They then advised him of his constitutional rights, and gave him an index size card containing on one side the warnings that (1) the defendant had the right to remain silent, (2) anything he said can be used against him in court, (3) he had the right to talk to a lawyer for advice before being asked any questions and to have a lawyer with him during questioning, (4) if he could not afford a lawyer, one would be appointed for him before any questioning, and (5) he had a right to stop answering at any time. The opposite side of the card stated that the defendant had read the rights, understood them, was willing to make a statement without a lawyer's presence, and that he understood and knew what he was doing. This side of the card was signed by the defendant. Agent Kelly testified that it was his recollection that Fields had first advised defendant of his rights. Having read the card, Fields gave it to the defendant to read. When the defendant said he could not read, Fields asked if defendant understood his rights. The defendant stated that he did understand his rights, and signed the card. Fields, in his testimony, and the notation on the first page of the FBI log indicate, however, that it was Kelly who first advised defendant of his rights. In either case the process of the warnings and the defendant's signing expended approximately four (4) minutes.

Having signed the waiver of rights card, the defendant was then shown photographs of himself taken during the robbery of Fidelity Bank on an earlier occasion. The defendant admitted that the photographs were of him, and that he had robbed numerous other institutions. He also stated that he was glad that he had been arrested, and had in fact attempted to have himself arrested on two prior occasions. Kelly explained that the FBI had received two phone calls stating that a person fitting the description of the person in the published photographs was at a certain bar. Each time the phone caller gave a name with variations of Henry Derek Young. In addition, the defendant stated that he had at one time been stopped by a Philadelphia police officer who said that he recognized Young as the person in the published photographs suspected of robbing a bank. The police officer did not, however, arrest the defendant. Kelly stated that the defendant was glad to

get the crimes off his chest, get them cleared up, and obtain assistance for his drug problem.

The defendant related the facts concerning seven other bank robberies. In reference to the robbery of PFS&LA, the defendant stated that he had requested Charles Lark, the co-defendant in this case, to write a demand note. Both Kelly and Fields testified that they were surprised by the defendant's ability to recollect the specific details of each of the seven other robberies that had occurred since August 31, 1972. They testified that the defendant's recall of the details of the robberies was better than their own even though they were the case agents on some of the robberies. Kelly testified that the defendant had been asked at the beginning of the interview if he felt all right. The defendant responded that he did feel all right. Both agents stated that the defendant appeared physically normal, did not appear to have withdrawal symptoms, spoke coherently, and that there was nothing abnormal about defendant's eyes.

Kelly and Fields at about 5 P.M. transported the defendant to the FBI offices. After arriving at FBI offices, the defendant was given food, and he made a phone call. There was no response, however, to defendant's call. At approximately 6:30 P.M. a further interrogation began. This interrogation was conducted by FBI agents King and Fields. Again King and Fields' testimony was substantially the same. During the approximately next two hours, the defendant gave statements admitting to the following eight bank robberies: (1) Continental Bank (18th and Walnut Streets) on August 31, 1972, (2) Fidelity Bank (7th and Market Streets) on September 1, 1972, (3) First Pennsylvania Bank (16th and Cherry Streets) on September 8, 1972, (4) Fidelity Bank (24th and Manning Streets) on September 15, 1972, (5) Western Savings Bank (15th and Walnut Streets) on September 22, 1972, (6) Industrial Valley Bank (15th and Walnut Streets) on September 25, 1972, (7) Fidelity Bank (6th and Market Streets) on September 28, 1972, and (8) PFS&LA on October 3, 1972. Before all but the last statement, the defendant was told that he would be asked about a specific bank robbery, he was read the warning of waiver of constitutional rights and asked if he understood that he was waiving his rights. Each time the defendant said he understood he was waiving these rights, and signed a standard FBI form to that effect. In total the defendant had his constitutional rights read to him on eight occasions, including the reading given at CCD, and each time the defendant indicated he understood that he was waiving his rights.

Before the defendant was taken to jail at approximately 10:30 P.M. to be held for an appearance before the U. S. Magistrate the next day, he made two more phone calls and was given refreshments. King testified that he knew the defendant was a narcotic addict but that the defendant appeared physically normal. He also testified that he had asked the defendant how he felt about six or seven times. Each time the defendant stated that he felt all right. Finally, Kelly testified that he called the Magistrate at 7 P.M. and was told by the Magistrate to hold the defendant over night. He was to bring the defendant before the Magistrate the next morning. The defendant was not brought before a Magistrate until November 11, 1972, thirty-nine (39) days after his arrest. He was, however, indicted October 4, 1972, the day after the arrest.

The defense's only witness was Dr. Kenneth John Barber, Jr., a clinical psychologist. Dr. Barber is the chief psychologist for adult services at the Northeast Mental Health Center in Philadelphia, is on the staff of Hahnemann Hospital, and teaches at Bucks County Community College. He has a Master of Arts and a Doctor of Philosophy degree in Psychology from Temple University. Barber interviewed the defendant on December 29, 1972, for approximately one-half hour. The defendant was seen again by Barber on January 10, 1973 for

approximately an hour at which time the defendant took certain tests to determine his mental capacity. The test results showed that the defendant had a full-scale I.Q. of 57 with a 62 verbal I.Q. and a 56 non-verbal I.Q. It was Barber's opinion that that the defendant was within a mentally defective range and would be considered mildly mentally retarded. In addition, Barber testified that a person of the defendant's age with a 57 I.Q. had a second grade reading level with the intelligence of an eight or nine-year old. It was Barber's opinion that a person of defendant's intelligence would not be able to understand that he was waiving his constitutional rights even though they were read to him.

The government, while not rebutting Barber's testimony, sought to minimize its accuracy and persuasiveness. On cross-examination Barber testified that the I.Q. measurement was based on a comparison of defendant's age with persons of the same age, that experience with the test would affect the ability to score well, that experience with the criminal law would increase the ability to understand a waiver of constitutional rights, and that motivation would affect a person's score.

It was further adduced during Dr. Barber's testimony that defendant had completed four years of schooling apparently in classes for orthrogenically backward persons. The written report of Barber notes that the defendant did not know the colors of the United States flag, and that his thinking abilities may have been effected by the use of LSD and glue sniffing. There is no evidence that defendant, in fact, engaged in these activities.

At the January 30th hearing the government presented testimony by Mr. Albert Levitt. Mr. Levitt is Chief Psychologist for the Philadelphia Court of Common Pleas, and has been associated with that office for six (6) years. He is also associated with the Temple University Unit on Law and Psychiatry, has practiced clinical psychology at Borden-

town Correctional Institution and Trenton State Prison, has worked with the Pennsylvania Parole Board Narcotic Unit, and has been a consultant to the Pennsylvania and New Jersey Board of Corrections and the Federal Parole Board. He has a Master of Arts degree in psychology from Temple University, and has completed one year of credit in psychology at Temple University beyond the Master of Arts degree. In addition, Mr. Levitt lectures at Villanova University on forensic psychology. In his testimony Mr. Levitt stated that he had examined more than three thousand (3000) persons during his practice as a clinical psychologist. During an interview with the defendant on January 29, 1973, Mr. Levitt administered six different tests to the defendant for the purpose of determining the defendant's ability to comprehend and understand.

On the Kent Emergency Scale Test the defendant registered a 53 I.Q. comparable to the intelligence of an eight (8) year old. In reference to the Kent test Mr. Levitt testified that the defendant "misses on larger conceptual" matters, that the defendant does not know directions, does not know the colors of the United States flag, and does not know why the moon appears larger than the stars. On the Wechsler Intelligence test (verbal) the defendant registered an I.Q. of 66. On the Vineland Social Maturity Scale Test (a test designed to ascertain the ability of a person to help himself in common everyday activities, e. g. dressing, eating) the defendant had the ability of a nine (9) year old. Similar results were recorded in reference to the other tests administered. A common strain in Levitt's testimony, however, was that the defendant was oftentimes malingering in his answers, was generally impulsive, had a short attention span, was indifferent and at times hostile resulting in answers well below his ability. Furthermore, Levitt stated that the defendant's emotional complex affected adversely his intellectual ability, that the defendant's responsiveness to questions is better if the questions are asked in a

manner the defendant appreciates and that defendant has a higher intellect, than the test scores indicated. Finally, it was Levitt's firm conclusion that the defendant could understand the warnings given him on the FBI Waiver of Rights Form. Cross-examination did not alter Levitt's firm conviction that the defendant could understand the Miranda warnings given him, and that, in view of the defendant's record, the defendant would understand better than the average person criminal proceedings and the usefulness of having an attorney's aid.

Finally, defendant's arrest record includes eleven arrests since February 18, 1970 for other crimes. He served seventeen days in jail for carrying a concealed deadly weapon (ccdw). He has been found not guilty on one charge of ccdw and a charge for illegal possession of narcotics. Other charges await trial.

█ ██ Of the five grounds advanced by the defendant in support of the motion to suppress only the contention that defendant did not knowingly and intelligently waive his right to remain silent requires extensive consideration. There clearly was probable cause to arrest the defendant. Probable cause exists when "the facts and circumstances within their [the arresting officers] knowledge and of which they have reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L. Ed.2d 142 (1964); Brinegar v. United States, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); United States ex. rel. Dessus v. Pennsylvania, 316 F.Supp. 411, 416 (E.D.Pa.1970) aff'd. 452 F.2d 557, 561 (3rd Cir. 1971). The defendant was arrested virtually within minutes of the robbery; he was seen by both officers running away from the area of the bank that had just been robbed. This knowledge in addition to defendant's behavior in looking back as though someone might be in pursuit constitutes more than sufficient

evidence to establish probable cause. Under these circumstances the belief that the defendant had just committed the reported robbery is not significantly lessened by the lack of a description of the alleged robber. To require in these circumstances that the arresting officers have a description of the alleged robber would only enhance the chances that the robber would successfully flee without adding meaningfully to the interests of security from unreasonable searches and seizures the Fourth Amendment seeks to protect. As stated in *Brinegar*: "The rule of probable cause is a practical, non-technical conception affording the best compromise that has been found for accommodating . . . often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice." Brinegar v. United States, 338 U.S. *supra* at 176, 69 S.Ct. at 1311. Thus, we find that there existed probable cause to arrest the defendant.

█ Defendant next contends that the government, knowing the defendant was a frequent user of narcotics, was required to obtain medical attention for him before being permitted to interrogate. There was no evidence that the defendant at the time of the interrogation was either under the influence of narcotics or suffering withdrawal pains. *Compare* United States ex rel. Collins v. Maroney, 287 F.Supp. 420 (E.D.Pa. 1968) *with* United States ex rel. Sadler v. Pennsylvania, 306 F.Supp. 102 (E. D.Pa.1969) aff'd 434 F.2d 997 (3rd Cir. 1970). Furthermore, absent some indication of physical ailment resulting from an illness a layman would be reasonably able to recognize, and absent a request for medical attention, we do not believe the government should be required to establish an accused's physical well-being before being able to interrogate. *Compare* United States v. Watson, 469 F.2d 362 (5th Cir. 1972), The contention advanced by defendant was impliedly rejected in United States ex rel. Sadler v. Pennsylvania, 306 F.Supp. *supra* at 104.

The court in *Sadler* rejected petitioner's contention that his confession was involuntary when it was taken while he was suffering preliminary withdrawal symptoms. Although the *Sadler* court did not wish to rely on the voluntariness of petitioner's confession in rejecting a habeas corpus petition, we think the court's reasoning rebuts a per se rule that failure to obtain medical attention when the government knows an accused is a frequent user of narcotics renders the confession inadmissible.

■ Defendant contends that the warnings given by the FBI do not comport with Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). It is asserted that it is not sufficient that an accused is told that if he cannot afford a lawyer one will be appointed and that anything the accused says *can* be used against him. Instead, defendant contends an accused must be told that he has a right to "free counsel" and that anything he says *will* be used against him. Commonwealth v. Dixon, 432 Pa. 423, 248 A.2d 231 (1968); Commonwealth v. Ritchey, 431 Pa. 269, 245 A.2d 446 (1968); Commonwealth v. Singleton, 439 Pa. 185, 266 A.2d 753 (1970) are cited in support of these propositions. The state may, of course, afford more rights than are required by the United States Constitution. United States ex rel. Payton v. Rundle, 472 F.2d 36 (3rd Cir. 1972). We are satisfied, however, that the warnings given the defendant in this case comport with *Miranda*. *See* Hodge v. United States, 392 F.2d 552 (5th Cir. 1968); Lathers v. United States, 396 F.2d 524, 535 n. 10 (5th Cir. 1968); United States v. Wallace, 272 F.Supp. 841 (S.D.N.Y.1967). Furthermore, although the FBI Waiver of Rights Form does not state that a person has a right to free counsel if he cannot afford counsel, we believe the statement on the form that if a person cannot afford a lawyer one will be appointed sufficiently informs an indigent person of his right to counsel as stated in *Dixon*. The Pennsylvania Supreme Court has never held that the *sine qua non* for a knowing waiver by an indigent of the right to the assistance of counsel at a custodial interrogation is the utterance of the words "free counsel". In Commonwealth v. Marsh, 440 Pa. 590, 271 A.2d 481 (1970), the court stated:

A reading and rereading of the relevant testimony leaves us in doubt, and therefore, we cannot say that, from the record, it clearly appears Marsh was told or was aware of all of his rights. The interrogating police officer testified in pertinent part: " * * * he [Marsh] was told that he had the right to any attorney and if he could not afford one, one would be obtained for him." We are not persuaded that this, in itself, fully apprized Marsh of his right to the assistance of counsel without charge if he were indigent.

*Id.* 440 Pa. at 595, 271 A.2d at 484. Two Justices, however, in a concurring opinion stated:

I am unable to see wherein this statement [the officer's statement of the right to counsel] does not comport with the warning prescribed by *Miranda*. Appellant argues that the adjective "free" was not used in this warning in connection with the word "lawyer", but there is no requirement either by the United States Supreme Court or in our own prior decisions that the word "free" must be used in this connection.

*Id.* 440 Pa. at 597, 271 A.2d at 485. Finally, in Commonwealth v. Marsh, 448 Pa. 292, 293 A.2d 57 (1972) the court stated:

When we found that appellant's confession was inadmissible [in the prior *Marsh* opinion], we did so solely because we were not persuaded that the appellant was fully apprised that the Commonwealth would bear the economic costs of providing appellant with counsel, if he were indigent, as is required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). There was little authori-

ty interpreting how this information should be conveyed properly. Two of the seven justices of our court disagreed with that decision. *Id.* 448 Pa. at 297, 293 A.2d at 61. The difficulty in *Marsh* unlike *Dixon* appeared to be more a matter whether the evidence was clear to convince the court that the accused understood he would be given the assistance of counsel if he could not afford counsel rather than the adequacy of the form of the warning given. We think the form of the warning used in the case before us comports with *Miranda*. Defendant's reliance on *Singleton* is misplaced. The court in Singleton disapproved of the use of a warning which states that any statement given by an accused could be used "for or against him" at trial. The Pennsylvania Supreme Court's discussion of the use of the words "may", "can and will", and "can" in a Miranda warning was merely illustrative of the United States Supreme Court's own interchangeable use of these words in the *Miranda* opinion. Singleton does not mandate for state officials the use of "will" rather than "can" in a *Miranda* warning.

■ Defendant contends that Fed. R.Crim.P. 5 was violated (1) when the custodial period was unnecessarily extended for interrogation about bank robberies other than the one robbery which took place the day of the arrest and (2) because of the delay in bringing the defendant before a Magistrate. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) mandate, in order to insure compliance with Rule 5(a) requiring a person making an arrest without a warrant to take the arrested person without unnecessary delay before the nearest available Magistrate, that any evidence taken during a period of unnecessary or unreasonable delay in arraignment may not be admitted in federal criminal proceedings. "It is not the lapse of time but the use of the time, when the commissioner or magis-

trate is unavailable, to employ the condemned psychologically coercive or third degree practices which is proscribed by the cases." United States v. Marrero, 450 F.2d 373, 376 (2nd Cir. 1971) cert. denied 405 U.S. 933, 92 S.Ct. 991, 30 L.Ed.2d 808 (1972). The confession in this case was given within two and one-half hours of arrest. All the confessions were given within six hours of arrest. There is no evidence of using delay in bringing the defendant before a Magistrate simply to procure incriminating statements. The defendant was in state custody until 5 P.M. The agents reached a Magistrate at 7 P.M. and were told to hold the defendant overnight. The next day the Grand Jury returned indictments obviating the necessity of bringing the defendant before the Magistrate. United States v. Conway, 415 F.2d 158 (3rd Cir. 1969) cert. denied, 397 U.S. 994, 90 S.Ct. 1131, 25 L.Ed.2d 401 (1970). Under these circumstances, we do not think that any delay in bringing the defendant before a Magistrate affects the admissibility of the confessions given. *See also* 18 U.S. C. § 3501 (1970) (confession given within six hours of arrest is admissible if voluntary); United States v. Keeble, 459 F.2d 757 (8th Cir. 1972); United States v. Marrero, 450 F.2d 373 (2nd Cir. 1971) cert. denied 405 U.S. 933, 92 S.Ct. 991, 30 L.Ed.2d 808 (1972); United ed States v. Halbert, 436 F.2d 1226 (9th Cir. 1970).

■■ Finally, we consider the question whether the defendant had sufficient mental capacity to knowingly waive his right to remain silent and to the assistance of counsel. We apply a preponderance of the evidence test, Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); United States v. Watson, 469 F.2d 362 (5th Cir. 1972), and, of course, the Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) standard of a knowing and intelligent waiver of constitutional rights, Miranda v. Arizona, 384 U.S. 436 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Reliance by the defendant is placed primarily on Cooper v. Griffin, 455 F.2d 1142 (5th Cir. 1972). *Cooper* in turn relied upon United States ex rel. Simon v. Maroney, 228 F.Supp. 800 (W.D.Pa. 1964) and United States ex rel. Lynch v. Fay, 184 F.Supp. 277 (S.D.N.Y.1960). In *Cooper* the court held inadmissible confessions given by two boys who were fifteen and sixteen years old at the time they were taken into custody for committing an armed robbery. Both boys had reading comprehensions not above the second or third grade; their I.Q. ranged from 61 to 67; neither had any previous experience with the criminal process; the evidence showed they were mental retardees; there was evidence that neither could understand Miranda warnings given them; and one had been suffering from a gunshot wound at the time of the interrogation. In *Simon* the court granted a habeas corpus to a defendant who had pled guilty. The defendant had spent his entire school career in a special class for retarded children, his I.Q. was between 55 and 61; he had no previous experience with the criminal process, and he was eighteen when arrested. Similarly, in *Lynch* the court granted a habeas corpus to a defendant who had pled guilty. The defendant had an I.Q. of 74, a mental age of eleven and one-half (11½), and the evidence indicated he was a "borderline defective having subnormal intelligence." The plea had been entered in 1923 at the age of 17. Lynch at the time of the plea in 1923 had been convicted of juvenile delinquency, petty larceny and unlawful entry. There was also evidence the defendant was induced to plead guilty by the prosecutor who warned the defendant that he could get five (5) years for parole violation.

We conclude that the facts in the case before us require a finding that the defendant knowingly and intelligently waived his right to remain silent and to have the assistance of counsel. Unlike *Cooper, Simon* and *Lynch*, the defendant has had extensive dealings with the criminal process during a time when he would not be considered a youth. His arrest record indicates that he has been acquitted on two serious charges. He is twenty-two years old, and there is considerable evidence that the defendant simply desired to relate the facts surrounding the offenses for which he was charged. And, there is no evidence of overbearance by the agents in an attempt to use the defendant's low mental abilities to extract a confession.

Furthermore, we note that the procedures for taking a guilty plea are more stringent than those for waiving Miranda rights. See United States v. Martinez, 413 F.2d 61, 64 (7th Cir. 1969); United States ex rel. Codarre v. Gilligan, 363 F.2d 961, 966 (2nd Cir. 1966). Both cases relied on by the *Cooper* court involved the taking of a guilty plea. *See also* United States ex rel. Miner v. Erickson, 428 F.2d 623, 635 n. 5 (8th Cir. 1970) (Judge Lay dissenting). In Kercheval v. United States, 274 U.S. 220, 223, 47 S.Ct. 582, 583, 71 L.Ed. 1009 (1927) the court stated:

A plea of guilty differs in purpose and effect from a mere admission or an extrajudicial confession; it is itself a conviction. Like a verdict of a jury it is conclusive. More is not required; the court has nothing to do but give judgment and sentence. Out of just consideration for persons accused of crime, courts are careful that a plea of guilty shall not be accepted unless made voluntarily after proper advice and with full understanding of the consequences.

Thus, we cannot assume from the failure of the government to give the "simple and direct explanation that . . . would be necessary in dealing with a person of petitioner's intelligence level." United States ex rel. Lynch v. Fay, 184 F.Supp. at 281, that the defendant did not understand the significance of his waiver of constitutional rights. It cannot be argued that at the time of interrogation the defendant was not fully aware of the seriousness of the charges lodged against him. We are satisfied

that his experience with the criminal process and the other factors mentioned establish his ability to understand the need for aid in defending against those charges. He nevertheless, we are convinced, knowingly and intelligently waived his rights to remain silent and to the assistance of counsel.

We, therefore, deny defendant's motion to suppress evidence.