UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert Andrew GLOVER,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Marvin Melvin MORROW,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Eugene Leonard WELSER,
Defendant-Appellant.

Nos. 78–2133, 78–1981 and 78–1982.

United States Court of Appeals,
Ninth Circuit.

May 9, 1979.

Daniel F. Cook, Asst. Fed. Pub. Defender, San Francisco, Cal., Roger S. Ruffin, San Francisco, Cal., James F. Hewitt, Federal Public Defender, San Francisco, Cal., and Marilyn Waller, San Francisco, Cal., for defendants-appellants.

Floy Dawson, Asst. U. S. Atty., San Francisco, Cal., Sanford Svetcov, Chief Asst. U. S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before MOORE *, WRIGHT and CHOY, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

The defendants were convicted of receiving and concealing stolen property moving in interstate commerce. 18 U.S.C. § 2315 (1976). Glover and Welser appeal the denial of motions to dismiss based on alleged governmental interference with the attorney-client relationship.

Glover also appeals the trial court's determination that he was competent to waive his *Miranda* rights and stand trial, and that he did in fact waive his rights. All three defendants appeal the court's refusal to admit polygraph test results into evidence. We affirm.

## I. FACTS

On October 24, 1977, Victor Nash, a wholesale gem dealer, was robbed of over $2,000,000 in gems as he was transporting his inventory to a gem show in a Seattle department store. Several days later, defendants were arrested in San Francisco and Oakland, California.

A. *Glover.*

Glover was arrested as he and another attempted to sell some of the gems to an undercover agent. Shortly after his arrest, he was advised of his *Miranda* rights. He told the FBI agents that he was willing to talk, that he had not been involved in the robbery, but that he knew the gems were stolen. The agents did not ask him to sign the standard FBI waiver of rights form until the next day, when they read the form to him again and required him to read it back to them. He read the form aloud with difficulty, requiring assistance in pronouncing some of the words. He then signed the form and made an oral statement.

The agents reduced the statement to writing and asked him to sign it. He asked if signing it would mean that he was admitting guilt. When told that it would, he refused to sign.

On October 28, Claudia Wilken, Assistant Federal Public Defender, was appointed as his counsel. She and Assistant United States Attorney Floy Dawson discussed the possibility of giving Glover special consideration if he would cooperate in the recovery of the gems. He rejected the offer because the government was unwilling also to drop charges against a co-defendant. It is undisputed that Wilken did not give permission to the FBI to interview her client.

On November 2, Agent Robinson arranged for two other agents to question Glover in the absence of counsel.[1] They told him he would be released if he would reveal the location of the gems and testify against his co-defendants. When he asked if his attorney should not be present, the agents responded that she had given her consent to the questioning.

Soon after the interview had begun, Wilken finished meeting with another client in the same holding cell area and walked past the cell in which the agents were questioning Glover. She denied having given permission for the interview and terminated it. No evidence against the defendants resulted from the meeting. After the agents left, Glover expressed concern that Wilken had "crossed" him.

At trial, Glover first moved to dismiss the indictment because of the FBI's attempted interference with the attorney-client relationship. The court censured Robinson's conduct[2] and stated that it would have

---

* Senior Circuit Judge of the Second Circuit.

1. Robinson asserts that he "was given the impression" in a conversation with Dawson that Wilken had given her permission for the interview. Dawson denies giving such an impression.

2. [Agent Robinson's] conduct in the thing indicates . . someone incompetent, because he misunderstands conversations, not on one occasion, but two, both with you [Ms. Wilken] and with Mr. Dawson, separate and distinct conversations. I certainly can't accept any statement of that kind as . . . being a misunderstanding. It shows a person who perhaps becomes so obsessed with his business that he excludes any possibility of listening to what's going on. I can under-

suppressed any statements or evidence resulting from the interview. Since no information was obtained, however, the court concluded that dismissal was too extreme a sanction and denied the motion.

Glover then moved to suppress statements made to the FBI agents after his arrest, alleging that he was mentally deficient, unable to understand the waiver form, and thus incapable of knowingly and intelligently waiving his *Miranda* rights. Alternatively, he argued that he did not in fact waive those rights. He asserted also that he was incompetent to stand trial.

The court ordered him to undergo medical examinations and heard expert testimony on his mental condition.[3] Presented with conflicting testimony, the court chose to believe the government's expert and independent evidence that Glover was competent to waive his rights and stand trial. It also concluded he did waive his rights, and denied the motion to suppress.

### B. *Welser.*

Welser was arrested by Agent Robinson on October 30. At his arraignment the following day before a United States Magistrate, Welser's appointed counsel argued that his client was suffering from methadone withdrawal and was therefore unable to make a voluntary choice whether to talk to the FBI. The Magistrate issued an order proscribing the FBI agents from discussing the case with the defendant without counsel's knowledge and consent. After Robinson had taken Welser from the courtroom, he told him: "We're the good guys. We're the feds. You can talk to us; if you want to talk to us, we'll listen to you."

On a motion to dismiss the indictment for interference with the attorney-client relationship, the trial judge again deplored

stand a thing like that in some situations, but not this one.

. . . . .

As a matter of fact, I cannot pass it off by saying there's a misunderstanding, knowing the high quality in the past, of the agency that Mr. Robinson represents. And apparently he has not been imbued with the quality

Robinson's conduct but found no prejudice that would warrant dismissal. The motion was denied.

### C. *Morrow.*

The sole error alleged by Morrow is the trial court's refusal to admit into evidence the results of a polygraph examination. He is joined in this assignment of error by the other defendants.

The day after the robbery, Victor Nash took a polygraph test administered by the Seattle Police Department. The report concluded that,

in the opinion of the examiner he was *attempting deception* when he answered "No" to the following relevant questions:

1) "Concerning the Robbery yesterday—did you conspire with anyone to steal those gems and other jewelry?"

2) "Regarding the theft of the gems and jewelry—were you directly involved in that Robbery?" (Emphasis in original.)

The examiner had prefaced his report, however, with the following comment:

Before this test was administered it was understood that the subject was not in an ideal state physically or emotionally. He stated that he had gone without sleep since the incident occurred, [*sic*] and that he was "worn out." However, he insisted on taking the examination since he planned to leave Seattle soon to return to his home in San Francisco.

The examiner also noted that at one point Nash appeared to be angry and that "anger can cause false responses."

After the trial court considered offers of proof on the motion to admit the results of the polygraph test, it denied the motion.

of conduct of his agency by his conduct in this matter. To pass everything off as just mere misunderstanding is shocking to me, that there should be misunderstandings in things of this kind.

3. The delay engendered by the medical examinations caused Glover to be tried separately from Welser and Morrow.

## II. ISSUES

We face the following questions:

1. Should the government's alleged interference with the attorney-client relationship result in a dismissal of the indictments against Glover and Welser?

2. Was Glover competent to waive his *Miranda* rights and stand trial, and did he in fact knowingly and intelligently waive his rights?

3. Should the polygraph test results have been admitted?

## III. DISCUSSION

A. *Interference with the Attorney-Client Relationship.*

Glover argues that Robinson's conduct interfered with his relationship with his attorney, and that the interference amounted to a violation of his Sixth Amendment right to the assistance of counsel. He argues further that, although he experienced no observable prejudice from Robinson's conduct, the error cannot be harmless. Since there was no evidence to suppress, defendant asserts the only way to deter future misconduct by government agents and to correct the injustice to himself is to dismiss the indictment.

Glover cites two state cases in which courts dismissed the charges after holding that egregious governmental conduct deprived the defendants of the effective assistance of counsel. *Commonwealth v. Manning*, 367 N.E.2d 635 (Mass.1977); *People v. Moore*, 57 Cal.App.3d 437, 129 Cal. Rptr. 279 (1976).

In *Manning*, after the defendant was arraigned on a drug charge and received appointed counsel, a DEA agent telephoned him at work without the knowledge or consent of his attorney. The purpose of the agent's call was to persuade the defendant to cooperate in undercover investigations of narcotics traffic. Apparently in an effort to convince the defendant to cooperate, the agent made disparaging remarks about counsel and warned that the tactics chosen by counsel would not ensure that the de-fendant would stay out of jail. When the defendant tried to reach the agent by telephone the following day, he talked instead to another agent who repeated essentially the same message.

The state trial court condemned the behavior of the DEA agents, but denied the motion to dismiss the indictments. An appellate court concluded that a new trial would be the proper remedy. The Supreme Judicial Court of Massachusetts reversed both courts, holding that the facts of the case required a dismissal of the indictment despite the lack of any explicit showing of prejudice.

The facts here are clearly distinguishable from those in *Manning*. The most damaging interference with the attorney-client relationship there was the impression the DEA agents attempted to convey that the defendant's counsel was incompetent. The effects of disparaging comments about counsel, particularly when coupled with a warning that reliance on counsel's judgment will not keep the defendant out of jail, can be detrimental to the attorney-client relationship and are not easily dispelled. Under such circumstances, a defendant may be deprived of the right to counsel.

Here, although we agree with the district court that Robinson's behavior in arranging for Glover's interview was not the result of a "misunderstanding," the object of the interview was not to belittle counsel, but rather to discover the location of the missing gems and to secure Glover's testimony against his co-defendants.

There is no indication that the agents who questioned Glover disparaged his counsel in any way. Unlike the possibly lingering doubts caused by the imputations on counsel's competence made in *Manning*, the concern expressed by Glover that his counsel had "crossed" him by consenting to the interview could be dispelled easily with a simple explanation.

The facts in *Moore* also are clearly distinguishable, and do not convince us that Glover was denied the right to counsel or that

dismissal of the indictment is appropriate here.[4]

Glover also cites Supreme Court cases to establish that Robinson's conduct denied him the right to counsel. *E. g., Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). The interference with the attorney-client relationship proved in those cases, however, is significantly more serious than that alleged here. The object of the agent's "Christian burial speech" in *Brewer* and the surreptitious surveillance in *Massiah* was to obtain incriminating statements to be used against the defendants at trial. As the court held in *Massiah,*

> the petitioner was denied the basic protections of [the right to counsel] guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel.

377 U.S. at 206, 84 S.Ct. at 1203. The same language was quoted as a basis for the decision in *Brewer.*

The facts here are easily distinguishable from those in *Brewer* and *Massiah.* The interview was interrupted by Glover's counsel shortly after it had begun. The object of the interview was not to obtain incriminating statements that could be used against the defendant at trial. Rather, it was to offer a dismissal of the charges against him in exchange for information about the missing gems and cooperation in testifying against his co-defendants. Glover gave no information about the gems and refused to cooperate. He made no statement that could be used as evidence against him. In short, no observable prejudice resulted from the interview.[5]

Glover asserts that prejudice is irrelevant when dealing with an alleged violation of the right to counsel. *See, e. g., Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976); *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).[6]

■ These cases seem to adopt the position that, once a Sixth Amendment violation has been established, the courts should not evaluate whether the error was harmless.[7] They do not provide, however, that

---

4. In *Moore,* the defendant was arraigned on a number of charges and counsel was appointed for him. Without the knowledge of his attorney, the district attorney's office arranged with him to engage in undercover work and testify in subsequent trials in exchange for what he believed would be dismissal of his case, termination of his parole, and assistance in relocating him with a new identity, police protection, and a sum of money.

He performed extensive undercover work and testified in two trials. He was told not to inform his attorney about his dealings with the district attorney's office. One of the investigators disparaged the competence of his attorney and falsely said that he had been disbarred. When the defendant finally came on for trial after the government refused to honor its commitments, the trial court dismissed the charges and the appellate court affirmed.

5. As noted above, Glover expressed concern that his counsel had "crossed" him, but there is no indication that he distrusted Ms. Wilken after she told him what had happened.

6. The court in *Glasser* stated that "[t]he right to have the assistance of counsel is too funda-

mental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." 315 U.S. at 76, 62 S.Ct. at 467.

7. As a preface to deciding whether an alleged infringement of the defendants' right to remain silent was harmless, the court in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), discussed "whether there can *ever* be harmless constitutional error." *Id.* at 20 (emphasis added). Petitioners urged the court "to hold that all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful." *Id.* at 21, 87 S.Ct. at 827. The court responded:

> We decline to adopt any such rule. All 50 States have harmless-error statutes or rules, and the United States long ago through its Congress established for its courts the rule that judgments shall not be reversed for "errors or defects which do not affect the substantial rights of the parties." 28 U.S.C. § 2111. . . . All of these rules, state or federal, serve a very useful purpose insofar as they block setting aside convictions for small errors or defects that have little, if any,

prejudice to the defendant is irrelevant in determining if the defendant indeed has been denied the right to counsel.

Not all police action that arguably could be called an interference with the attorney-client relationship is violative of the Sixth Amendment right to counsel. In *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977),[8] Weatherford, a government agent, was arrested and charged with Bursey in order to maintain his undercover status. At the request of Bursey and his counsel, Weatherford participated in two

meetings in which Bursey's approaching trial was discussed. Weatherford did not relate to his superiors any of the information discussed and, when called to testify for the government at trial, limited his testimony to his undercover activities with Bursey. The court concluded that there was no Sixth Amendment violation.

■ We realize that *Weatherford* is factually distinguishable from the situation here.[9] But we do not believe that the factual distinction overshadows an important principle to be read from the case: that the

likelihood of having changed the result of the trial. We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction.

*Id.* at 22, 87 S.Ct. at 827 (footnote omitted).

The court in dictum stated that "prior cases have indicated that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Id.* at 23, 87 S.Ct. at 827–828, citing *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), regarding the right to counsel. In *Gideon*, the defendant's request for state-appointed counsel was denied and he was convicted. The court held that the Sixth Amendment guarantee of the assistance of counsel in criminal cases is binding upon the states and reversed the conviction. The court did not hold that under no circumstances could a violation of the right to counsel be harmless.

Subsequent decisions of the Supreme Court, however, have built upon the dictum in *Chapman*. In a case, like *Glasser*, dealing with the impairment of the right to counsel because of joint representation of co-defendants, the court in dictum went beyond the specific factual situation presented and announced what could be interpreted as an automatic reversal rule in right-to-counsel cases:

This Court has concluded that the assistance of counsel is among those "constitutional rights so basic to a fair trial that the infraction can never be treated as harmless error." *Chapman v. California, supra*, 386 U.S., at 23, [87 S.Ct., at 827.] Accordingly, when a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense, reversal is automatic.

*Holloway v. Arkansas*, 435 U.S. at 489, 98 S.Ct. at 1181.

We are unpersuaded that the Supreme Court has promulgated an automatic reversal rule

whenever faced by a violation of the right to counsel. The holding of *Holloway* can be limited to its facts to allow the courts some leeway in remedying Sixth Amendment violations that do not affect the substantial rights of those asserting them.

The Fifth Circuit has recently recognized the possibility of harmless error in a right to counsel context. In *United States v. Kilrain*, 566 F.2d 979 (5th Cir. 1978), defendants asserted their Sixth Amendment right to the assistance of counsel had been violated when federal undercover agents and an informer met with one of the defendants, after he had been indicted, and discussed his approaching trial. After discussing defendants' reliance on *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the court concluded:

Not every interrogation in violation of the rule set forth in *Massiah* and *Brewer* mandates reversal of a conviction. Unlike the cited cases, there is no evidence to exclude in the present case, and no prejudice has been shown by the defendants.

566 F.2d at 982 (footnote omitted).

Because we conclude that there was no violation of the right to counsel here, we need not reach whether the facts as asserted would amount only to harmless error. But we agree with the Fifth Circuit that not every violation of the right to counsel requires an automatic reversal.

8. After he was convicted and had served his sentence, Bursey brought an action under 42 U.S.C. § 1983 against an undercover agent for and the head of the South Carolina State Law Enforcement Division, alleging that the defendants had deprived him of the effective assistance of counsel.

9. In *Weatherford*, the government agent was invited to attend the strategy sessions between Bursey and his attorney. Here, the FBI agents initiated the contact with Glover.

existence or nonexistence of prejudicial evidence derived from an alleged interference with the attorney-client relationship is relevant in determining if the defendant has been denied the right to counsel.[10]

We do not condone the behavior of Agent Robinson. We agree with the district court that, had the interviewing agents obtained any evidence that could have been used against Glover, this would be a different case.

But we cannot accept defendant's argument that an interview—even when conducted without permission of counsel—that is terminated shortly after it had begun, undertaken not to obtain incriminating statements against the defendant, and concluded before any evidence is obtained can be construed as a violation of the right to counsel requiring a dismissal of the indictment.[11] Even if Glover could establish that a Sixth Amendment violation occurred, he has cited no federal case that has remedied the violation by dismissal.[12]

■ Welser's claim of a denial of the right to counsel is susceptible of similar analysis. We deplore Agent Robinson's conduct in speaking to Welser about the case immediately after the court had ordered him not to do so without counsel's presence or consent. But there is no indication that Welser suffered any prejudice because of Robinson's remark. He made no statement to the agent and there is no indication that he trusted his appointed counsel any less because of it. We simply are unable to say that Robinson's attempt to interfere with the attorney-client relationship, as reprehensible as it was, amounted to a constitutional violation of the right to counsel.

Absent proven Sixth Amendment violations, we cannot disturb the convictions of Glover and Welser on the basis of Agent Robinson's conduct.

### B. Competence to Waive Miranda Rights and Stand Trial.

#### 1. Testimony and Evidence Relevant to Competence

At the suppression hearing, expert testimony revealed that Glover received a score of 67 on the Wechsler Adult Intelligence Test, which categorizes him as a "mental defective" and places his intelligence level in the bottom one percentile of society.

---

10. The Court in Weatherford ventured,

    Had Weatherford testified at Bursey's trial as to the conversation between Bursey and Wise; had any of the State's evidence originated in these conversations; had those overheard conversations been used in any other way to the substantial detriment of Bursey; or even had the prosecution learned from Weatherford, an undercover agent, the details of the Bursey-Wise conversations about trial preparations, Bursey would have a much stronger case.

    429 U.S. at 554, 97 S.Ct. at 843 (footnote omitted).

    It is, perhaps, only an interesting academic exercise to hypothesize how the Court might have held in past cases had there been a different set of facts. But it is an open question whether the Court in Massiah and Brewer would have reversed the convictions had the efforts to obtain incriminating statements in the absence of counsel been fruitless, resulting in no prejudice to the defendants.

11. In reaching this conclusion, we do not follow the government's suggested application of United States v. Owen, 580 F.2d 365 (9th Cir. 1978). In Owen, the defendant alleged that a government agent interfered with his right to counsel by pressuring him to supply incriminating information against one of his attorneys. Using its "inherent supervisory powers," the court stated that "dismissal of an indictment on the basis of governmental misconduct is an extreme sanction which should be infrequently utilized," and refused to grant a dismissal because the defendant could establish no prejudice. Id. at 367.

    The government misreads the applicability of Owen here. We agree with Glover that Owen is not a Sixth Amendment case, but rather one arising under the general supervisory powers of the court. Thus, "any requirement of a showing of prejudice under Owen does not address the problem of governmental misconduct which is also a Sixth Amendment violation."

12. In Massiah and Brewer, the cases relied upon most heavily by the defendant to establish a right to counsel violation, "the Supreme Court established an Exclusionary rule for statements obtained as a result of an interrogation conducted after indictment and without the presence of defendant's counsel." Kilrain, 566 F.2d at 982 (emphasis added).

His low intelligence level is apparently the result of an accident and subsequent operation when he was a child that caused organic brain damage. Other expert testimony asserted that the waiver of rights form read to Glover requires a fifth to seventh grade reading comprehension level while Glover's reading ability lies between a first and second grade level.

As a result of this testimony, the district court ordered medical examinations of Glover to determine if he was competent to waive his *Miranda* rights when he made statements to the FBI and if he was competent to stand trial. The expert testimony at the competency hearing was conflicting.

Dr. Peal, the defense expert, concluded that Glover had suffered organic brain damage that precluded him from intelligently waiving his rights. Dr. Peal maintained that Glover did not understand the right to remain silent, did not know what "waiver" or "receiving stolen goods" meant, and did not know exactly what an attorney is or does. He also concluded from his examination that Glover lacked the ability to deceive and therefore could not falsify the results of tests or mislead an interviewer.

Dr. Komisaruk, a psychiatrist appointed by the court, testified that Glover had difficulty in placing past events in proper sequence, had an abbreviated attention span of from 20 to 30 minutes, and could not follow the events at a trial or assist his attorney in his defense. He also stated, however, that Glover had the ability to deceive an interviewer.

Dr. Kessler, the government's witness, testified that Glover was competent to waive his rights, plead guilty, and stand trial if questions, terms, and proceedings were explained to him in "simple words, simple sentences, perhaps using very specif-

ic, concrete examples." He added that Glover had some knowledge of what the charges against him meant [13] and had the ability to deceive.

### 2. *Waiver of Miranda Rights*

■ The government must prove by a preponderance of the evidence that a defendant knowingly and intelligently waived his *Miranda* rights. *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). When, as here, the defendant raises the issue of his ability to waive his rights, proving competence also becomes part of the government's burden. We must affirm the district court's determination of waiver unless it is clearly erroneous. *United States v. O'Looney,* 544 F.2d 385, 389 (9th Cir. 1976).

■ Glover argues that the district court erred in rejecting the weight of medical evidence presented at the competency hearing when it denied the motion to suppress. As a trier of fact, however, the court is not required to "count experts" in reaching its determinations. It need not be bound by expert medical testimony at all if other probative evidence points to a different result. *See United States v. Winn,* 577 F.2d 86, 93 (9th Cir. 1978). Here, it chose to believe the testimony of Dr. Kessler that Glover was competent to waive his rights if they were explained to him in simple language. In addition, it could refer to other evidence probative of the defendant's competence.

He was convicted previously for another incident of receiving stolen property and had an extensive criminal record. The agent who interviewed him after his arrest testified that "he responded normally, gave appropriate answers to the questions . . . seemed to have no problems enunciating exactly what he desired to state", and un-

---

**13.** Dr. Kessler testified:

I asked [Glover] what he thought he was being charged with, and he said the charges against him were those of receiving, and then I asked him, "well, what does that mean?" and he said that means if something's been stolen and police catch you with it, then, he went on to say he'd been involved in an

offense of that sort in the past in which he'd been in a car, which had been stopped, and there had been some T.V. sets in the trunk or whatever, were found to have been stolen, and even though he had not stolen the T.V. sets, just because he was in the car, he was charged with receiving.

derstood what was happening to him. He could remember and related in some detail specific facts about the offense charged and those involved.

There was independent evidence that Glover had carried the gems into the van in which the purchase negotiations had taken place, and that he had assisted in the negotiations. He also had held a gun on the undercover agent while the agent was frisked for a recording device.

Despite these additional factors, Glover maintains on the authority of *Cooper v. Griffin,* 455 F.2d 1142 (5th Cir. 1972), that he was incapable of knowingly and intelligently waiving his rights. In *Cooper,* two brothers, 15 and 16 years old, were arrested for armed robbery. It was undisputed that both had low I.Q.'s and were mental retardees. But neither "had [any] previous experience with the criminal process" and "[t]here was substantial *uncontroverted* testimony that neither boy was capable of meaningfully comprehending the *Miranda* warning." *Id.* at 1144–45 (emphasis added). During the interrogation, one was suffering from a gunshot wound. The court held that the boys could not have made a knowing and intelligent waiver of their rights and that their confessions were inadmissible.

We believe that *United States v. Young,* 355 F.Supp. 103 (E.D.Pa.1973), is more persuasive here. In *Young,* the defendant was convicted of bank robbery, partly on the basis of a confession obtained after federal agents read him his rights and he signed a waiver form. Tests revealed that he had an intelligence level slightly lower than Glover's and had a second grade reading ability. The defense expert testified that he could not understand his constitutional rights sufficiently to waive them, even if they were read to him. The government expert testified to the contrary. He had been arrested numerous times in the preceding three years. On the basis of these facts, the court concluded that

the defendant knowingly and intelligently waived his right to remain silent and to have the assistance of counsel. Unlike

[in] *Cooper* . . . the defendant has had extensive dealings with the criminal process during the time when he would not be considered a youth. . . . He is twenty-two years old, and there is considerable evidence that the defendant simply desired to relate the facts surrounding the offenses for which he was charged. And, there is no evidence of overbearance by the agents in an attempt to use the defendant's low mental abilities to extract a confession.

*Id.* at 111.

■ The facts here are similar to those in *Young.* Despite defense testimony to the contrary, there was expert opinion that Glover could understand his *Miranda* rights if they were explained in simple language. We cannot say the district court was clearly erroneous in accepting the testimony of Dr. Kessler and concluding Glover was competent to waive his rights.

*Young* also bears upon whether Glover, although competent to waive his rights, did so knowingly and intelligently. He claims that, because the agents did nothing more than read the form to him and help him to read it back, he did not knowingly and intelligently waive his rights because they were not explained to him in "simple words [and] simple sentences."

But, as with the defendant in *Young,* Glover has had "extensive dealings with the criminal process during a time when he would not be considered a youth." This experience has made him familiar with the right to remain silent, the right to counsel, and the option to waive those rights. As noted above, the agents who warned him of his rights shortly after his arrest testified that he appeared to understand them and to respond appropriately. In light of all the facts, we conclude that the district court was not clearly erroneous in finding that Glover knowingly and intelligently waived his rights.

### 3. *Competence to Stand Trial*

■ The standard by which competency to stand trial is measured is whether

the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960). *See also DeKaplany v. Enomoto,* 540 F.2d 975, 979 (9th Cir. 1976) (en banc). The trial court may use evidence other than expert testimony in making its determination. *Winn,* 577 F.2d at 93. Our standard is the clearly erroneous test. *Id.* at 92.

■■■ Although the medical testimony was conflicting, there is ample evidence on the record that Glover was competent to stand trial. The fact that a defendant might not understand the proceedings unless they are explained to him in simple language would put an additional burden upon counsel, but certainly does not establish that the defendant is incompetent to stand trial. Here, the defendant displayed a good knowledge of the facts surrounding his arrest and had an understanding of the charge against him. In light of Dr. Kessler's testimony, we conclude that the trial court was not clearly erroneous in finding Glover was competent to stand trial.

### C. *Admissibility of Polygraph Test Results.*

■■■ The defendants attempted to have Nash's polygraph test results admitted into evidence to show that Nash had engineered the "theft" of the gems and that, therefore, defendants could not be guilty of receiving stolen property. The district court denied their motion to admit the results.

We have held consistently that the district courts have wide discretion in deciding whether to admit polygraph test results. *See, e. g., United States v. McIntyre,* 582 F.2d 1221, 1226 (9th Cir. 1978); *United States v. Radlick,* 581 F.2d 225, 229 (9th Cir. 1978); *United States v. Benveniste,* 564 F.2d 335, 338–39 (9th Cir. 1977); *United States v. Flores,* 540 F.2d 432, 437 (9th Cir. 1976); *United States v. Marshall,* 526 F.2d 1349, 1360 (9th Cir. 1975), *cert. denied* 426 U.S. 923, 96 S.Ct. 2631, 49 L.Ed.2d 376

(1976); *United States v. Demma,* 523 F.2d 981, 987 (9th Cir. 1975). In *Marshall* we said that "a trial court will rarely abuse its discretion by refusing to admit the [polygraph] evidence, even for a limited purpose and under limited conditions." 526 F.2d at 1360.

The defendants' reliance on *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and *United States v. Hart,* 344 F.Supp. 522 (E.D.N.Y.1971), to establish that the trial court abused its discretion is misplaced. *Chambers* proscribed the use of technical rules of evidence to exclude information and prevent witnesses from testifying in violation of the defendant's right of confrontation and right to present witnesses in his defense. Both rights were protected here. Nash experienced careful cross-examination about his story of the robbery and the court did not prevent the defendants from calling witnesses essential to the defense.

In *Hart,* the court found a violation under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when the government failed to reveal that a polygraph test administered at the prosecution's behest to its principal witness indicated that he was lying. Here, it was Nash who insisted on taking the examination and there was no *Brady* violation because the government revealed the results to the defendants.

The test results here were unreliable. In the preface to his report, the polygraph examiner noted that Nash had gone without sleep and "was not in an ideal state physically or emotionally." He also noted that Nash appeared to be angry at one point. These conditions could have affected significantly the examination results. In its offer of proof, the government said the examiner was prepared to testify that, had he known the results might be admitted into evidence, he would have refused to conduct the examination.

The district court did not abuse its discretion in refusing to admit the test results.

### IV. CONCLUSION

The convictions are

AFFIRMED.