111 F.3d 705
 46 Fed. R. Evid. Serv. 1422, 97 Cal. Daily Op.
Serv. 2789,
97 Daily Journal D.A.R. 4917
UNITED STATES of America, Plaintiff-Appellee,
v.
Altaf AMLANI, aka: William Montgomery; aka: John Strong,
Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Altaf AMLANI, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Altaf AMLANI, aka: William Montgomery; aka: John Strong,
Defendant-Appellant.
 Nos. 94-50292, 95-50215 and 95-50603.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 3, 1997.
Decided April 16, 1997.
 
 David A. Katz, Katz & Associates, Los Angeles, California, for defendant-appellant.
 Ronald L. Cheng, Assistant United States Attorney, on appeal, Los Angeles, California, for plaintiff-appellee.
 Appeals from the United States District Court for the Central District of California, William J. Rea, District Judge, Presiding. D.C. Nos. CR-93-00524-WJR, CR-93-00524-WJR-1.
 Before: PREGERSON, REINHARDT, and WIGGINS, Circuit Judges.
 WIGGINS, Circuit Judge:
 
 
 1
 Altaf Amlani appeals his conviction and sentence for wire fraud and conspiracy. This court has jurisdiction under 28 U.S.C. § 1291. We find that Amlani's contention regarding disparagement of counsel, if established as true in an evidentiary hearing, justifies a new trial. We find that none of Amlani's other contentions warrants reversal of his conviction or sentence. Accordingly, we REMAND this case for further findings regarding allegations of disparagement of Amlani's original counsel.
 
 BACKGROUND
 
 2
 Amlani was the president and owner of Finer Images ("FI"), a telemarketing company from the Los Angeles area. FI's employees would tell prospective customers that they were eligible for valuable prizes, such as cars, cash, a home entertainment center, and/or jewelry. To claim their prize (or prizes), the customers were told they needed to buy advertising specialties, such as pens, T-shirts, and key chains, which were imprinted with the customer's business name, address, and phone number. These purchases ostensibly would eliminate gift taxes by making the prize a promotional award rather than a gift.
 
 
 3
 FI's sales pitches misrepresented the customers' chance of winning the grand prizes, namely the cars and cash. The evidence presented at trial showed that FI awarded only inexpensive watches or jewelry. Although FI claimed these prizes were worth over $1000 apiece, the evidence showed that the wholesale value was $38-49 for each bracelet and $69 for each watches. Customers that ordered once were subjected to additional high-pressure sales pitches, with more promises of valuable prizes (referred to at trial as "reloading" the customers). The grand prizes, other than the jewelry of questionable value, were never awarded. Cynthia Mai, an FI employee, testified that no customers had any chance of receiving the valuable grand prizes.
 
 
 4
 The Federal Bureau of Investigation ("FBI") began an undercover investigation, with agents posing as representatives of a company that produced a "cold call" machine to make initial sales pitches to potential customers and as a telemarketer acting as a reference for the machine company. During the operation, FBI agents interviewed Amlani and other FI employees, gathering potentially damaging statements. After a demonstration of the machine to FI, FBI agents then posed as potential customers responding to the machine's cold calls. FI employees made misrepresentations to the FBI agents in these "hot tests."
 
 
 5
 Amlani and two associates were indicted on one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371, and twenty counts of wire fraud, in violation of 18 U.S.C. § 1343.
 
 
 6
 Following a jury trial, Amlani and his codefendant Hepburn were convicted on all counts of the indictment. On May 10, 1994, Amlani was sentenced to fifty-seven months in prison, in addition to three years supervised release, restitution, a fine, and a special assessment. Amlani timely appealed his conviction. He obtained two limited remands from this court to litigate post-trial motions, and he timely appealed the district court's orders on those motions as well.
 
 ANALYSIS
 
 7
 I. Alleged Disparagement of Amlani's Attorney
 
 
 8
 Amlani claims he was deprived of his right to counsel because the prosecutor repeatedly disparaged his original chosen trial counsel, David Katz, in front of him. Amlani alleges that the government essentially told him and his wife that Katz did not care about Amlani, was not competent, and could not prevent Amlani's conviction. Amlani claims this disparagement violated the Sixth Amendment because it caused him to change to a different and less competent counsel for trial. The Government denies the disparagement.
 
 
 9
 We review de novo whether the alleged disparagement violated the Sixth Amendment if it caused Amlani to fire his chosen trial counsel and hire a replacement. See United States v. Benlian, 63 F.3d 824, 826 (9th Cir.1995) (reviewing de novo an allegation of ineffective assistance of counsel in violation of the Sixth Amendment). Amlani's allegations are presumed true for purposes of this appeal because the district court did not hold an evidentiary hearing. United States v. Irwin, 612 F.2d 1182, 1187 (9th Cir.1980).
 
 
 10
 We have previously held that while the harmless error rule may not apply to a Sixth Amendment violation, the existence of prejudice is relevant to determine whether an alleged interference with the attorney-client relationship deprives a defendant of a right to counsel. United States v. Glover, 596 F.2d 857, 863-64 (9th Cir.1979); cf. United States v. Morrison, 449 U.S. 361, 364-65, 101 S.Ct. 665, 667-68, 66 L.Ed.2d 564 (1981) (leaving open question of whether prejudice was required to establish any Sixth Amendment violation because the Court found that in any event the dismissal of the indictment was an inappropriate remedy absent showing of prejudice).
 
 
 11
 The district court denied Amlani's motion to vacate the conviction on this ground because Amlani did not allege that his replacement trial counsel was inadequate. Thus, the district court held that Amlani failed to show the required prejudice necessary to establish a Sixth Amendment violation.
 
 
 12
 Amlani contends that he need not show prejudice in the form of inadequacy of replacement counsel to prove a Sixth Amendment violation, relying on Glover, 596 F.2d at 861; People v. Moore, 57 Cal.App.3d 437, 129 Cal.Rptr. 279, 281-82 (1976); and Commonwealth v. Manning, 373 Mass. 438, 367 N.E.2d 635, 638 (1977). Rather, he claims that he was prejudiced by the government intentionally undermining his confidence in his chosen counsel, which caused him to abandon his counsel of choice and to retain different counsel for trial.
 
 
 13
 The Government responds that Amlani was not prejudiced for two reasons. First, it argues that the alleged disparagement did not involve communication between the prosecutor and the represented defendant outside the presence of defense counsel. Thus, it argues that Amlani's chosen counsel had the opportunity to neutralize all the alleged disparagement. Second, it claims that Amlani was not prejudiced because he was represented by a different attorney who provided adequate representation.
 
 
 14
 We are faced with an issue not squarely presented to previous courts: does disparagement of counsel in front of a defendant and in the counsel's presence violate the Sixth Amendment if it causes the defendant to retain different counsel?[1] The prosecutor's alleged comments disparaged defense counsel (like Manning, which found prejudice, and unlike Glover, which did not) and so allegedly caused Amlani to retain different counsel. On the other hand, the comments were not made outside the presence of defense counsel or his associate.
 
 
 15
 We are unpersuaded that the distinction between whether defense counsel was present is determinative. The government's ex parte communication with a criminal defendant may aggravate the potential for harm, but disparagement is inappropriate even in the presence of defense counsel. Accordingly, we turn to the question of prejudice.
 
 
 16
 We are mindful that "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Wheat v. United States, 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988). Thus, the Sixth Amendment right to select one's counsel may be limited in several important respects: a defendant is not entitled to representation by one who is not a licensed attorney; the counsel cannot be involved in a previous or ongoing relationship with an opposing party; and a defendant is not entitled to an attorney he or she cannot afford or who for other reasons declines to represent the defendant. Id. We hold that the right is not so limited, however, that the availability of adequate replacement counsel allows the government effectively to veto defendant's choice of counsel by intentionally undermining his confidence in the attorney-client relationship through disparagement.[2]
 
 
 17
 Amlani need not make a showing that his replacement counsel was inadequate in order to establish prejudice. Prejudice can result from "government influence which destroys the defendant's confidence in his attorney." Irwin, 612 F.2d at 1187 (finding no prejudice because the defendant produced no evidence of disparagement). See also Strickland v. Washington, 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984) (noting that prejudice can be presumed with "various kinds of state interference with counsel's assistance" because prejudice in those circumstances is likely and because it is easy for the government to prevent misconduct for which it is directly responsible). Thus, a change in defense counsel caused by the prosecution's misconduct itself establishes the requisite prejudice to vacate his conviction.
 
 
 18
 This conclusion differs from that reached by the district court in United States v. Lopez, 765 F.Supp. 1433, 1456 (N.D.Cal.1991), rev'd on other grounds, 4 F.3d 1455, 1463 (9th Cir.1993). The district court in Lopez refused to dismiss an indictment based on the Sixth Amendment because the defendant could obtain adequate representation by replacement counsel, but it did dismiss the indictment under its supervisory powers. Although we reversed the dismissal, our decision in Lopez does not control this case for two reasons. First, in the Lopez appeal, we were faced only with a dismissal under the court's supervisory powers for an ethical violation, not for a violation of the Sixth Amendment. Lopez, 4 F.3d at 1464. Second, Lopez dealt with the dismissal of an indictment, a more extreme remedy for disparagement than vacating a conviction with the possibility of a retrial. Id.
 
 
 19
 We next consider the appropriate remedy for the alleged disparagement. "Our approach has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial." Morrison, 449 U.S. at 365, 101 S.Ct. at 668 (noting that reversal of conviction was less drastic because it still allowed government to choose to proceed to new trial). In this case, the requested remedy is not dismissal of the indictment, but rather vacation of the conviction for a new trial. This remedy would be appropriate to allow Amlani to face the government's charges with his counsel of choice free of any unconstitutional interference that occurred.
 
 
 20
 Although we decide that the allegations state a Sixth Amendment claim, we grant the government's request for a remand and an opportunity to rebut the allegations. The Government correctly contends that for the three alleged pre-indictment statements, the Sixth Amendment right to counsel had not yet attached. See United States v. Kenny, 645 F.2d 1323, 1338 (9th Cir.1981). Only prejudicial post-indictment disparagement can violate the Sixth Amendment. The effect of the post-indictment disparagement on Amlani should, however, be considered in light of pre-indictment statements in the same vein.
 
 
 21
 Because our holding on this issue does not result in automatic reversal of Amlani's conviction or sentence, we proceed to examine his other challenges to determine whether any of them require outright reversal. As we explain below, we conclude that they do not.
 
 II. Alleged Discovery Violations
 
 22
 Amlani alleges numerous violations of Federal Rule of Criminal Procedure 16(a)(1)(C) ("Rule 16") and of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). "To reverse a conviction for a discovery violation, we must find not only that the district court abused its discretion, but that the error resulted in prejudice to substantial rights." United States v. Baker, 10 F.3d 1374, 1398 (9th Cir.1993), cert. denied, 513 U.S. 934, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994). We review de novo allegations of Brady violations. United States v. Alvarez, 86 F.3d 901, 903 (9th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 748, 136 L.Ed.2d 686 (1997). Failure to provide information as required by Brady is constitutional error only if the information is material, that is, only if there is a reasonable probability that the result of the proceeding would have been different had the information been disclosed. Kyles v. Whitley, 514 U.S. 419, 434-36, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995).
 
 
 23
 A. The Government's Failure to Disclose Evidence
 
 
 24
 Amlani identifies five items of evidence that the government failed to produce, allegedly resulting in violations of both Rule 16 and Brady. First, Amlani contends that the government failed to produce a compliance letter written by an attorney, Mr. Pick, that outlined procedures to ensure that FI complied with telemarketing laws ("Pick file"). The Pick file was allegedly seized from FI when the government executed a search warrant. Amlani contends that the Pick file would have allowed him to show that he intended to comply with the law and not to commit fraud.
 
 
 25
 The government concedes that it should have disclosed the file,[3] but argues that Amlani can demonstrate no prejudice under Kyles. It contends that the Pick file only provided a "cover" to make FI's misrepresentations look legitimate. We agree with the district court that Amlani did not show a reasonable probability that the outcome would have been different had the Pick file been disclosed. The memo is consistent with the prosecution as well as the defense theories. Moreover, the evidence from the FBI sting operation, the testimony of FI employee Cynthia Mai, and testimony of the customers seem most telling about the intent and actions of Amlani. We will not reverse for this failure to produce.
 
 
 26
 Second, Amlani claims that the government failed to produce a purchase order for a Mercedes-Benz that it seized during its search of FI. Amlani contends that this document would have contradicted Mai's testimony that Amlani never intended to purchase a Mercedes to award to a winning customer. Even assuming the government actually had possession of such an order, it would not have contradicted Mai's testimony. She testified that none of the customers won or had a chance to win the Mercedes, not that no Mercedes was purchased. The focus of the trial was whether the customers were deceived about their chances of receiving valuable prizes, such as the Mercedes, not whether FI purchased the prizes.[4] Amlani did not demonstrate the required prejudice from the failure to produce the purchase order, and we will not reverse on this ground.
 
 
 27
 Third, Amlani claims that the government failed to turn over seized FI internal memoranda allegedly containing Amlani's warnings to his employees not to make misrepresentations. If such documents were in the government's possession, they should have been turned over. Again, however, we do not find the required prejudice. Mai's testimony and the evidence of the FBI operation supported a prosecution theory consistent with the existence of the documents--that Amlani attempted to cloak FI's misrepresentations behind documents that looked good but were ignored in practice.
 
 
 28
 Fourth, Amlani contends the government should have turned over internal FBI logs tracking what items were taken, where they were stored, and how they were moved, citing United States v. Banks, 374 F.Supp. 321, 330 (D.S.D.1974). He alleges that the government has turned over two such logs, but refuses to turn over any other logs. Amlani failed to show how the logs themselves were material, as required by Rule 16(a)(1)(C) and Brady. We agree with the district court that the government is not obligated under Rule 16(a)(2) to turn over internal government documents like the logs at issue, regardless of whether it previously turned over other logs. Moreover, Rule 16(a)(2) clarifies that a defendant has an interest in the actual evidence in the government's control, not the government's records of that evidence. Accordingly, we will not reverse on this ground.
 
 
 29
 Fifth, Amlani contends that the government improperly failed to provide him with a transcript of his own grand jury testimony as required by Rule 16(a)(1)(A). That testimony, he claims, would demonstrate prosecutorial misconduct (such as browbeating and providing an allegedly misleading statement about Amlani's rights) that would have supported a motion to dismiss the indictment. Amlani's grand jury testimony involves a series of invocations of his Fifth Amendment right not to produce documents as custodian of records for FI. Thus, there is no reasonable probability that the trial would have reached a different outcome had the transcript been made available. Moreover, the alleged prosecutorial misconduct was simply a comment that Amlani could consult with his attorney but he could not write down every question verbatim. Regardless of whether this statement was proper, Amlani was not prejudiced by the nondisclosure of the grand jury testimony. Even with the transcript, Amlani could not have established the prejudice required for a prosecutorial misconduct claim because Amlani was in fact able to ask his attorney about each question.
 
 
 30
 In sum, although we find that the cumulative nature of the alleged Rule 16 and Brady violations is troubling, reversal is nonetheless not warranted. Government's trial counsel did not perform admirably. While no single alleged violation calls into question the verdict, the cumulative impact of all the alleged violations make this a closer case. See Kyles, 514 U.S. at 436-38, 115 S.Ct. at 1567 (requiring consideration of cumulative impact, rather than isolated examination of each alleged violation). Nonetheless, Amlani focuses on evidence that is not inconsistent with the government's case. Thus, we find that Amlani failed to demonstrate the required prejudice to justify vacating his conviction.
 
 
 31
 B. Alleged Improper Government Access to Documents
 
 
 32
 We further find that Amlani failed to show the required prejudice resulting from the government's alleged review of the Pick file and certain seized notes prepared by Katz, specifically an outline of Katz's interview with FI employee Paul Turman. As discussed above, the government presented substantial evidence on Amlani's intent and FI's practices. Any alleged access to the Pick file therefore was not prejudicial.
 
 
 33
 Amlani claims that had he had the Turman notes available, he would have been able to decide properly whether to exercise his own right to testify without fear of unfounded rebuttal testimony from Turman. Amlani claims the notes would have given him the security of being able to impeach any bad rebuttal testimony with Turman's prior exculpatory statements. Also, he claims, the government might well have called Turman and unintentionally presented exculpatory statements, had it not had access to the results of Katz's Turman interview.
 
 
 34
 The government responds that the decision not to call Turman did not turn on whatever might have been the contents of the Katz interview. It seems overly speculative to conclude that but for its possession of the Katz notes, (1) the government would have called Turman, (2) Amlani would have been able to impeach him based on the Katz interview, and (3) this impeachment would have likely resulted in a different verdict. Accordingly, Amlani's claim fails on this ground.
 
 III. Alleged Prosecutorial Misconduct
 
 35
 Amlani alleges six acts of prosecutorial misconduct. None of the allegations has any merit. Where, as here, the trial counsel failed to object, this court reviews for plain error. United States v. de Cruz, 82 F.3d 856, 861 (9th Cir.1996). In order to prove plain error, Amlani must show that any error affected his substantial rights. Fed.R.Crim.P. 52(b).
 
 
 36
 First, Amlani claims that the prosecutor improperly appealed to religious prejudice by drawing attention to his "foreign-sounding name and physical appearance" and by referring to the Bible. The prosecutor opened his closing argument as follows:
 
 
 37
 You may recall that during an undercover meeting at the Ritz Carlton in September of 1992, Defendant Altaf Amlani made the following observation. "I think it's time for an Eleventh Commandment: Thou Shall Not Become a Telemarketer. Thou Shall Not Become a Telemarketer."
 
 
 38
 First of all, there is no need for an Eleventh Commandment. There is already a Seventh Commandment that provides: Thou Shall Not Steal. Additionally, there are laws, federal laws in the United States, which make it a crime to commit telemarketing fraud.
 
 
 39
 Amlani claims this was an appeal to religious prejudice, requiring reversal. Amlani notes that the district court did not provide a specific curative instruction. A general instruction can be sufficient to render harmless any error from an arguable appeal to the parochial inclinations of jury, at least under these circumstances. See United States v. Williams, 989 F.2d 1061, 1072 (9th Cir.1993).
 
 
 40
 The reference to the Seventh Commandment was not misconduct requiring reversal because it was isolated, it was logically connected to a statement the defendant had made relating to the undercover investigation of the case, and it was immediately followed by reference to federal laws under which Amlani was being tried for telemarketing fraud. In addition, the jury was instructed to decide the case on the evidence, not on personal opinions, prejudices or sympathy. Furthermore, the statement did not rise to the level of misconduct held harmless in United States v. Levy-Cordero, 67 F.3d 1002, 1008-09 (1994) (not reversing even though prosecutor recited a hymn about good and evil and then vouched for the "good" of the prosecution's witnesses and the "evil" of the defense, where the misconduct was not strong enough to overcome court's clear instruction to decide based on the evidence and not argument), cert. denied sub. nom., Forty-Estremera v. United States, --- U.S. ----, 116 S.Ct. 1558, 134 L.Ed.2d 659 (1996), and in United States v. Giry, 818 F.2d 120, 132-34 (1st Cir.1987) (finding error harmless even where prosecutor likened defendant to "Peter who for the third time denied Christ.").
 
 
 41
 Moreover, his claim that the prosecutor committed misconduct by continually stressing his allegedly "foreign-sounding" name is meritless. Amlani cites no authority that repeated reference to the defendant by name is misconduct.
 
 
 42
 Second, Amlani claims that the prosecutor's rebuttal during closing argument contained an improper plea to the jury to feel sympathy for some of the witnesses testifying against him. The prosecutor first called upon the jury to "feel at least a little sympathy for some of the witnesses who had to testify in this trial" because they had to travel under subpoena to testify, sometimes about people they knew for years. Any impropriety was mitigated because the prosecutor proceeded to tell the jury not to decide the case based on sympathy alone, but rather on reason and "most importantly" on common sense. Thus, these statements do not rise to the level of plain error.
 
 
 43
 Third, Amlani claims that the prosecutor in his closing rebuttal improperly made the analogy that defense counsel, like a surgeon, would do his job whether his "patient" is guilty or innocent. He claims this is reversible error, citing United States v. Friedman, 909 F.2d 705, 710 (2d Cir.1990), and United States v. Murrah, 888 F.2d 24, 27-28 (5th Cir.1989). Defense counsel made the original surgeon analogy: that, as with surgery, Amlani could not conduct his own defense. The prosecutor simply countered that the presence of an attorney did not make the client innocent. The prosecutor also specifically stated that
 
 
 44
 And as you have been instructed and reminded several times, the statements of lawyers, questions that are loaded with conclusions, are not evidence. My statement now is not evidence. It is the facts: the people on the stand, the tapes that you heard, the documents that you reviewed. It is on that, it is on that that the United States bases this case.
 
 
 45
 Given this statement, Amlani cannot object that the prosecution undermined the integrity of the proceedings or diverted the jury's attention from deciding the case on the evidence. The cases Amlani cites involved prosecutors' comments that attacked the defense by focusing on the defense counsel, not the evidence. Reversal is unwarranted on this ground.
 
 
 46
 Fourth, Amlani claims that the prosecution improperly inflamed the jury by using a "parting shot" at the close of its argument-telling the jury not to let Amlani "reload you." The reference was to a telemarketing phrase for making additional sales to previous customers by duping them again. The prosecutor's statement is not so prejudicial as to warrant a new trial.
 
 
 47
 Fifth, Amlani objects that the prosecutor called Amlani a liar, which improperly drew attention to Amlani's decision to exercise his constitutional right not to testify. The Government's response is exactly correct--that the references to lying deal with Amlani's statements to his customers, not with his failure to testify at trial. There was no error in the prosecutor's statements.
 
 
 48
 Sixth, we find no merit in Amlani's objection to the prosecutor telling a parable from Aesop's fables. The point of the parable was that half-truths are false, not, as Amlani claims, that one of the two suspects in the story must be guilty. Even more tenuous is the contention that the parable improperly attacked Amlani's decision not to testify because the parable's suspects looked their accuser "dead in the eye."
 
 
 49
 IV. Preclusion of Cross-Examination About Victims' Tax Returns
 
 
 50
 Amlani contends that the district court improperly excluded cross-examination designed to impeach the testimony of the defrauded customers. We review for abuse of discretion the limitation of cross-examination by the trial court. United States v. Dudden, 65 F.3d 1461, 1469 (9th Cir.1995). We review de novo, however, whether the limitations violate a defendant's right to confrontation. United States v. Marbella, 73 F.3d 1508, 1513 (9th Cir.), cert. denied --- U.S. ----, 116 S.Ct. 2555, 135 L.Ed.2d 1073 (1996).
 
 
 51
 Amlani claims that the cross-examination would have established that the witnesses claimed on their tax returns that the money sent to Amlani for the promotional items was a necessary business expense. This, he argues, would impeach their testimony that they were defrauded because they sent the money in order to receive valuable prizes in addition to the promotional items. The district court excluded the evidence based on Federal Rule of Evidence 403, stating that the cross-examination would bring in collateral tax issues that would confuse the jury.
 
 
 52
 Amlani contends the preclusion of this type of examination improperly kept out impeaching testimony and violated his Sixth Amendment right to confrontation. However, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, ... confusion of the issues, ... or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986).
 
 
 53
 The district court precluded the cross-examination because it likely would confuse the jury. At most, the cross-examination would show that the customers reported the payments to Amlani as a business expense on their taxes. Amlani suggests that this tax reporting is inconsistent with their testimony that they were motivated to place orders by the offers of valuable personal gifts. This does not follow.
 
 
 54
 Whether the customers believed they were legitimate business expenses does not establish the customer's motivation for placing the order (i.e. whether they were defrauded by the promise of valuable prizes). The cross-examination might raise questions about the propriety of customers' tax treatment for the payments, but it would not have shown whether Amlani and his employees misrepresented the chances of winning valuable prizes to the customer witnesses. Rather than revealing what the customers felt was the value of either the promotional items or the promised prizes, the examination would, at most, reflect that the customers believed they could treat their entire payments as tax write-offs because they had in fact received promotional goods after they made the payments.
 
 
 55
 Moreover, violations of the constitutional right to cross-examine are subject to harmless error analysis. United States v. Jones, 766 F.2d 412, 414 (9th Cir.1985). Amlani was able to cross-examine the customers about their expectations regarding what awards they would receive and their interest in receiving the promotional items. Thus, reversal is not warranted on this ground.
 
 
 56
 V. District Court's Responses to the Jury Notes
 
 
 57
 Amlani objects that the district court improperly instructed the jury in response to two nearly identical notes the jury sent to the judge during deliberations. We review for abuse of discretion both the district court's formulation of jury instructions, United States v. de Cruz, 82 F.3d 856, 864 (9th Cir.1996), and the district court's response to a jury's inquiry. United States v. Warren, 984 F.2d 325, 329 (9th Cir.1993).[5]
 
 
 58
 The district court's original aiding and abetting instruction read as follows:A defendant may be found guilty of wire fraud, even if the defendant did not commit the act or acts constituting the crime but aided and abetted in its commission. To prove a defendant guilty of aiding and abetting, the government must prove each of the following beyond a reasonable doubt:
 
 
 59
 First, the wire fraud was committed;
 
 
 60
 Second, the defendant knowingly and intentionally aided, counseled, commanded, induced or procured another to commit wire fraud; and
 
 
 61
 Third, the defendant acted before the crime was completed.
 
 
 62
 It is not enough that the defendant merely associated with another person, or was present at the scene of the crime, or unknowingly or unintentionally did things that were helpful to the principal.
 
 
 63
 The evidence must show beyond a reasonable doubt that the defendant acted with the knowledge and intention of helping another person commit wire fraud.
 
 
 64
 The government is not required to prove precisely which defendant actually committed the crime and which defendant aided and abetted.
 
 
 65
 During deliberations, the jury asked for clarification of aiding and abetting. The second jury note, for example, asked
 
 
 66
 If an individual has knowledge of an act or intent by another person to comitt [sic] fraud but does nothing to interfere or prevent this act or intent, is he aiding or abetting in the act or intent?
 
 
 67
 When the district court and the attorneys discussed the jury note, defense counsel cautioned that the court should not suggest to the jury that any person has or has not acted in furtherance of the crime. The court's eventual response was to state
 
 
 68
 First of all, I think you have to be advised that an individual has no affirmative duty to prevent or to interfere with the commission of a crime such as we are discussing here and the one that you are considering, crime or crimes.
 
 
 69
 On the other side of the coin, you have to examine the conduct or lack thereof to determine, as the instruction says, whether there has been any aiding or abetting. Now the instruction says, as you no doubt have discussed: [original instruction is reread].
 
 
 70
 Amlani contends that the court erred in implying that conduct or lack thereof could constitute aiding and abetting.
 
 
 71
 Amlani's argument is unpersuasive. A fair reading of the response to the jury, including the original instruction, reveals that the district court informed the jury that simply failing to prevent a fraud is not aiding or abetting. The "lack thereof" comment addressed the defense counsel's expressed concern that the court's response not hint that any acts had occurred. The comment does not instruct the jury to consider the lack of conduct as a possible basis for conviction. Accordingly, we find no abuse of discretion in the district court's supplemental instruction.
 
 VI. Refusal to Give Puffing Instruction
 
 72
 Amlani claims that the district court erred in failing to give his proposed jury instruction on "puffing" because it precluded his theory of defense. We review de novo whether the jury instructions in their entirety cover the theory of defense. Duran, 59 F.3d at 941. This court reviews for abuse of discretion the district court's particular formulation of jury instructions. de Cruz, 82 F.3d at 864.
 
 
 73
 The district court gave the following "good faith" instruction:
 
 
 74
 The good faith of a defendant is a complete defense to the charge of wire fraud ... because good faith on the part of the defendant is, simply, inconsistent with the intent to defraud or the intent to obtain money or property by means of false or fraudulent pretenses, representations, or promises.
 
 
 75
 ...
 
 
 76
 A person who acts, or causes another person to act, on a belief or an opinion honestly held is not punishable under this statute merely because the belief or opinion turns out to be inaccurate, incorrect, or wrong. An honest mistake in judgment or an error in management does not rise to the level of intent to defraud....
 
 
 77
 While the term "good faith" has no precise definition, it means, among other things, a belief or opinion honestly held, an absence of malice or ill will, and an intention to avoid taking unfair advantage or another.
 
 
 78
 ...
 
 
 79
 If the evidence in the case leaves the jury with a reasonable doubt as to whether a defendant acted with an intent to defraud or obtain money or property by means of false or fraudulent pretenses, representations, or promises or in good faith, the jury must acquit that defendant.
 
 
 80
 Amlani was not satisfied with this instruction. He also wanted the court to give an instruction explaining that "mere puffing," exaggerated enthusiasm, and high-pressure salesmanship do not constitute fraud provided it simply magnifies an opinion of the advantages of a product without falsely asserting the existence of qualities the product does not possess. Amlani's proposed instruction accurately stated the law. Cf. Bulgo v. Munoz, 853 F.2d 710, 716 (9th Cir.1988) (finding misrepresentation cannot be based on an expression of opinion).
 
 
 81
 Nonetheless, the district court did not err in refusing to give the instruction. We have previously found that a "good faith" instruction similar to the one given in this case adequately instructed the jury about "the gist of a 'puffing' defense." United States v. Gay, 967 F.2d 322, 329 (9th Cir.1992) (holding that the sufficiency of the original instruction and the deficiency of the defendant's proposed supplemental instruction were independent bases to reject the defendant's proposed instruction). The district court was not required to do more.
 
 
 82
 VII. Claimed Double Jeopardy Because of Civil Forfeiture
 
 
 83
 Amlani claims that his conviction violated the Double Jeopardy Clause of the Fifth Amendment because FI's bank accounts and office equipment were previously forfeited to the government. We review de novo the district court's rejection of a claim that a criminal conviction is barred under the Double Jeopardy Clause. United States v. Washington, 69 F.3d 401, 403 (9th Cir.1995).
 
 
 84
 The government notified Amlani that it seized for forfeiture certain FI bank account funds. Amlani alleges that the government also seized for forfeiture FI's office equipment. The government subjected these items to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A). It first initiated an administrative proceeding under 19 U.S.C. § 1607(a) because the items were worth less than $500,000. After Amlani filed a claim and posted the required bond, the matter was referred to the U.S. Attorney's office for judicial forfeiture proceedings. The government denies the judicial forfeiture actually occurred.
 
 
 85
 Even if a prior forfeiture did occur, the Double Jeopardy Clause was not violated. In order to determine the prior forfeiture bars a subsequent criminal proceeding, the Supreme Court has adopted a two-part test: (1) whether Congress intended the forfeiture proceedings to be criminal or civil; and (2) whether the forfeiture proceedings were so punitive in fact that the proceedings must be seen as criminal. United States v. Ursery, --- U.S. ----, ----, 116 S.Ct. 2135, 2147, 135 L.Ed.2d 549 (1996). The Court held that Congress did not intend civil in rem forfeiture under 18 U.S.C. § 981 to be criminal punishment. Thus, the only remaining question is whether there is the "clearest proof" that the forfeiture proceedings were "so punitive in form and effect as to render them criminal despite Congress' intent to the contrary." Id. at ---- - ----, 116 S.Ct. at 2148-49.
 
 
 86
 Amlani claims that the only reason the assets were seized was a punitive attempt to prevent him from adequately defending himself. The Court in Ursery set forth nonpunitive goals that are served by section 981 forfeitures--such as insuring that property owners will not permit their property to be used for illegal purposes. Ursery, --- U.S. at ----, 116 S.Ct. at 2148. Thus, Amlani cannot show that the civil forfeiture and the criminal conviction subjected him to Double Jeopardy. Id. at ----, 116 S.Ct. at 2149; see also Caplin & Drysdale v. United States, 491 U.S. 617, 631, 109 S.Ct. 2646, 2655 (1989) (rejecting argument that Sixth Amendment is violated by forfeiture of assets that might have been used to pay for a defense).
 
 
 87
 Amlani's reliance on earlier Supreme Court cases is misplaced. As the Court itself explained the distinctions, United States v. Halper, 490 U.S. 435, 440, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487 (1989) was expressly limited to the civil penalties, not civil forfeitures; Austin v. United States, 509 U.S. 602, 622, 113 S.Ct. 2801, 2812, 125 L.Ed.2d 488 (1993) was limited to forfeitures under the Excessive Fines Clause of the Eighth Amendment; and Department of Revenue of Montana v. Kurth Ranch, 511 U.S. 767, 777-84, 114 S.Ct. 1937, 1945-48, 128 L.Ed.2d 767 (1994) dealt with a tax proceeding under the Double Jeopardy Clause. Ursery, --- U.S. at ---- & ----, 116 S.Ct. at 2144 & 2147.
 
 
 88
 We therefore reject Amlani's double jeopardy argument.
 
 
 89
 VIII. Sentencing Determination of Amount of Loss U.S.S.G. § 2F1.1
 
 
 90
 Amlani contends that the district court erred in two respects in calculating the victims' loss to be used in setting his sentence. United States Sentencing Guidelines § 2F1.1 provides for a base offense level of 6 for cases involving "fraud and deceit," and mandates increases in the base level depending on the amount of loss caused by the fraud. We review de novo the claim that the district court applied an improper measure of value in calculating loss for determining a proper sentence. United States v. Kelly, 993 F.2d 702, 704 (9th Cir.1993).
 
 
 91
 Amlani's first argument is that he should be charged at most with the loss for those customers whom the government proved were defrauded, rather than all his customers. The testifying customers lost approximately $42,000, not $1.5 million. If that figure is used, the sentencing enhancement for this factor is only +4, not +12.
 
 
 92
 The problem with Amlani's argument is that the district court must only make a "reasonable estimate of the loss, given the available information." U.S. Sentencing Guideline Manual § 2F1.1, comment (n.8) (1994). The presentence report provided the amount of revenue generated by the telemarketing company. We have upheld as permissible, though not mandatory, a method of calculation of loss that was based in part on the intended loss to intended victims. Kelly, 993 F.2d at 704 ("That this measure of loss exceeds [defendant]'s gain from the illegal business is of no moment."); see also U.S. Sentencing Guideline Manual § 2F1.1, comment (n.7) (1994). Thus, the district court did not abuse its discretion in basing the loss caused by Amlani's scheme on the total number of customers (the intended victims), not on the total number of testifying customers.
 
 
 93
 Amlani's second argument--that the loss should be offset by fair market value, not wholesale value--was rejected when raised by his codefendant. United States v. Hepburn, 91 F.3d 156, mem. disp. (9th Cir.1996). Thus, under United States v. Schaff, 948 F.2d 501, 506 (9th Cir.1991), Amlani is precluded by the law of the case from making this argument. Amlani's attempts to distinguish Schaff are unavailing. We reject Amlani's contention that Schaff does not apply because he raised different arguments than Hepburn whereas the codefendants in Schaff joined in the same objection. The arguments Amlani raises on appeal are essentially the same as those that were disposed of by the Hepburn court. We also reject his contention that the earlier disposition involving Schaff's codefendant was a published decision--this is simply untrue. The earlier decision involved in that case was unpublished and controlled based on law of the case, not stare decisis. Thus, Amlani is precluded from raising the failed argument of his codefendant.
 
 
 94
 The district court did not err in calculating Amlani's sentence.
 
 CONCLUSION
 
 95
 For the foregoing reasons, we REMAND for an evidentiary hearing. At the hearing, the district court shall determine two questions: (1) whether the government in fact disparaged Amlani's original counsel, Mr. Katz, in Amlani's presence; and (2) whether this disparagement, if it occurred, caused Amlani to retain different counsel for his further defense in this case. If both questions are answered in the affirmative, then the district court should vacate Amlani's conviction. The government may seek a new trial. All future proceedings shall be consistent with this opinion.
 
 
 96
 REMANDED WITH INSTRUCTIONS.
 
 
 
 [1]
 Although Amlani and Katz had apparently only agreed to terms for certain pretrial representation, we are satisfied for purposes of this appeal that Amlani had intended to retain Katz for his entire defense. Katz had made an appearance in district court on behalf of Amlani. Further, Amlani's declaration states that he intended to retain Katz for the remainder of his defense. One of the issues for the district court to determine on remand is whether the alleged disparagement was the ultimate reason Amlani did not continue to retain Katz
 
 
 [2]
 Obviously, attacking counsel's arguments to the court while litigating the case is not implicated by our analysis of "disparagement."
 
 
 [3]
 According to the government, the file was not turned over due to screening procedures it used to prevent government trial counsel from reviewing potentially privileged material
 
 
 [4]
 Mai testified that Amlani wanted to give the Mercedes to a friend because he knew he legally had to give one away but did not want to give it to a customer and lose its whole value. Another witness testified that Amlani discussed awarding the car, but wanted to rig the drawing
 
 
 [5]
 We review de novo whether a challenged jury instruction misstates the elements of a crime or precludes an adequate presentation of the defense theory of the case. United States v. Duran, 59 F.3d 938, 941 (9th Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 535, 133 L.Ed.2d 440 (1995); United States v. VonWillie, 59 F.3d 922, 927 (9th Cir.1995). The issue here, however, is different: whether the district court's particular phrasing of the supplemental instruction was potentially misleading. In any event, the supplemental instruction would also survive de novo review