**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.

No. 97-4290

BENJAMIN SANTOLI, JR., a/k/a Glen
Stanton, a/k/a Ben Stanton,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.

No. 97-4315

SEAN ALAN NIEHLS, a/k/a John
Allen, a/k/a David Campbell,
<u>Defendant-Appellant.</u>

Appeals from the United States District Court
for the District of South Carolina, at Columbia.
Joseph F. Anderson, Jr., District Judge.
(CR-95-1045)

Submitted: March 17, 1998

Decided: February 12, 1999

Before WILKINS, NIEMEYER, and LUTTIG, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

Henry D. McMaster, TOMPKINS & MCMASTER, Columbia, South Carolina; Landon D. Long, Assistant Federal Public Defender, Columbia, South Carolina, for Appellants. J. Rene Josey, United States Attorney, Eric William Ruschky, Assistant United States Attorney, Robert McCausland, Third Year Law Student, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Appellants Benjamin Santoli and Sean Alan Niehls appeal their convictions for wire fraud, mail fraud, and conspiracy in violation of 18 U.S.C. §§ 371, 1341, 1342, 1343 (1994). Finding no error, we affirm the convictions.

I.

The Government's evidence at trial established that Santoli and Niehls worked as telemarketers for Reliable Products and Safeway Marketing.* The salespeople received from Reliable a list of potential customers, typically elderly, whom they would call. The salespeople, using aliases, used a format sales pitch called the "warehouse pitch." The warehouse pitch stated that the customer was going to receive "absolutely one of the nicest awards that I personally have ever given out in the history that I've [salesperson] been with the company," and further that the customer was receiving one of the nicest awards in the entire "giveaway." The salesperson told the customer that Reli-

_____

*Reliable Products is the predecessor company to Safeway Marketing.

2

able/Safeway was "celebrating," and that he was not going to be in any contest or lottery and that he was not competing with anyone else for the award. The salesperson then stated that the company had "spared no expense . . . [and] literally invested thousands and thousands of dollars."

The salesperson told the customer that he needed to place an order with the company to receive the award. If the customer balked at the original price, the salesperson "dropped down" to alternate scripts, simultaneously dropping the price. After a price had been agreed on, the salesperson would tell the customer that he would not be receiving a car or cash.

In spite of the salesperson's assertions that the customer would be receiving one of the "nicest awards" ever in the history of the "giveaway," and that a special, valuable award had already been selected, the award actually depended on how much money the customer sent to Reliable. Customers were never told that the"award" was not ordered until after they sent in money. The customers were likewise never told that the value of the "award" was based solely on how much money they spent. The customer typically received an award and products worth about 20% of how much money he sent in. Only once a check was received would Reliable order the product and award. Salespeople typically received a 35% commission on each sale.

Several of Reliable and Safeway's customers testified for the government. In each instance, the salesperson began by asking for about $2000 to $4000. In most cases the customer hesitated to send so much money, and the salesperson dropped the price. Most customers sent in between $500 and $2000, but in some cases customers sent in as much as $4000. Typically, the products the customer received were vitamins and toiletries. The "awards" were usually acrylic statues or Civil War memorabilia.

For example, Arthur Miller, 84 years of age, sent in $1199, and received vitamins and a statue called the "Zephyr," which cost Reliable $175. Dorothy Feight, 66, sent in about $600 and received a water treatment purifier, worth about $20, and a framed document with a picture and two ancient coins, for which Reliable paid $50.

3

Kathleen Orton sent in two checks totaling $698, and received cleaning products and a statue of a mother elephant with child, which cost Reliable $163. Paul Coffey, 67, sent in $1998, and received vitamins, mens' cosmetics, and a Civil War bullet. Leffie Popa, 73, sent in $998, and received cosmetics and an acrylic dolphin, which cost Reliable a total of $143.50, or about 15% of what Popa paid.

Former Reliable/Safeway salespeople also testified for the Government. Several of the salespeople admitted that most of the warehouse pitch was not true. There was no "giveaway;" the owners had not invested thousands of dollars; and the salespeople had no idea what the "award" would be and did not personally select it. One of the salespeople did not know exactly what product he was selling. Another testified that the "bottom line purpose was to get money," and that this was done by leading the customer to"believe they were going to get something of great value."

Santoli testified in his own defense. Santoli worked for Reliable for ten weeks from June to September, 1993, during which time he received about $2000 a week in commissions. When the Government questioned Santoli about the specific statements out of the warehouse pitch, he stated that the "manufacturer" referred to was Reliable Products, even though the only "manufacturing" Reliable ever did was to add a slogan to the vitamin bottles. When asked about the phrase "one of the nicest awards that I personally have ever given out," Santoli admitted that he did not personally give out a single award, and did not know what the customer was going to receive. Regarding the assertion that the customer would receive one of the nicest awards in the "entire celebration," Santoli admitted he had no idea what "celebration" Reliable was having.

The Defendants requested a jury instruction on "puffing." The proposed instruction stated that an "unspecific and false statement of opinion such as occurs in `puffing' cannot ordinarily constitute fraud;" that "puffing" is an exaggeration by "a salesperson concerning the quality of goods, which is not considered a legally binding promise;" and that representations about a company's products as being "among the finest . . . in the world" at worst was only "puffing" and not cognizable under the federal mail fraud statute. The trial judge

4

declined to give the proposed instructions. However, the trial judge did give a good faith instruction, stating in part:

> [G]ood faith on the part of the defendant is a complete defense to a charge of mail or wire fraud. A defendant, however, has no burden to establish a defense of good faith. The burden is on [the] government to prove fraudulent intent and the consequent lack of good faith beyond a reasonable doubt. Under the mail fraud statute, false representations or statements or omissions of material facts do not amount to a fraud unless done with fraudulent intent. However misleading or deceptive a plan may be, it is not fraudulent if it was devised or carried out in good faith. An honest belief in the truth of the representations made by a defendant is a good defense, however inaccurate the statement may turn out to be. . . . [T]he government must establish beyond a reasonable doubt that [the defendant] knew that his conduct as a participant in the scheme was calculated to deceive and nonetheless he associated himself with the alleged fraudulent scheme for the purpose of causing some loss to another.

On appeal, Appellants contend that there was insufficient evidence of a scheme to defraud to sustain the guilty verdicts, and that the trial court abused its discretion in not charging the jury regarding "puffing."

II.

The standard of review for sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendants guilty beyond a reasonable doubt. See United States v. Banks, 10 F.3d 1044, 1051 (4th Cir. 1993); United States v. Jackson , 863 F.2d 1168, 1173 (4th Cir. 1989). Here, there was sufficient evidence from which a rational jury could find the Defendants guilty.

Defendants contend essentially that, even if some of the statements made to customers were not true, at most they were "puffing" and not criminal conduct. However, the Defendants misrepresented to customers that they had been entered in "the manufacturer's giant give-

5

away," when in fact there was no manufacturer and there was no giant giveaway. The Defendants stated that the customer would be receiving a nice prize because "we pulled a few strings around here," when in fact, there was no attempt to "pull strings" or make any extra effort for that particular customer to receive a nice prize. Rather, the value of the prize simply depended on how much money the customer sent in.

Defendants misrepresented that the prize would be"one of the nicest awards that I personally have ever given out," when in fact the caller had no idea what the prize would be, nor had the caller ever personally given out any prizes for Reliable/Safeway. Defendants also misrepresented that the company had invested thousands and thousands of dollars on the non-existent "giveaway," hyping the products and awards, when in fact no money was invested in the products or awards until after the customer sent in a check. Defendants further concealed the fact that the award had not actually been selected yet. See United States v. Sneed, 63 F.3d 381, 387 (5th Cir. 1995). Accordingly, there was sufficient evidence from which a jury could find the existence of a scheme to defraud. See Carpenter v. United States, 484 U.S. 19, 27 (1987); United States v. Locklear , 829 F.2d 1314, 1318 (4th Cir. 1987); Lustiger v. United States, 386 F.2d 132, 138 (9th Cir. 1968).

III.

The decision of whether or not to give a particular jury instruction is reviewed for abuse of discretion. See United States v. Whittington, 26 F.3d 456, 462 (4th Cir. 1994).

Here, because the court instructed the jury on the issue of good faith as a defense to a crime requiring fraudulent intent, the jury was adequately instructed about the "gist of a `puffing' defense." United States v. Amlani, 111 F.3d 705, 717-18 (9th Cir. 1997); see United States v. Cain, 128 F.3d 1249, 1252 (8th Cir. 1997); United States v. Shelton, 669 F.2d 446, 465 (7th Cir. 1982). Accordingly, a separate "puffing" instruction was unnecessary, and the district court did not abuse its discretion in declining to give the Defendants' proposed instructions. See Amlani, 111 F.3d at 718; United States v. Thaw, 353 F.2d 581, 584-85 (4th Cir. 1965) (holding that when substance of

6

requested puffing charge covered in instructions actually given, failure to give puffing instruction not error).

We therefore affirm Appellants' convictions. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

<u>AFFIRMED</u>

7