UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:  Judges Beales, Fulton and Lorish
Argued by videoconference


COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
v.      Record No. 1048-22-4          JUDGE JUNIUS P. FULTON, III
                                      DECEMBER 20, 2022
NICHOLAS GIAMPA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Brett A. Kassabian, Judge

Lauren C. Campbell, Assistant Attorney General (Jason S. Miyares,
Attorney General, on briefs), for appellant.

Dawn M. Butorac, Public Defender, for appellee.


Nicholas Giampa is charged with the December 2017 murders of Scott Fricker and Buckley

Kuhn Fricker, and the use of a firearm in those murders. On January 16 and 17 of 2018, Giampa

was interviewed by Fairfax County police detectives. Following an evidentiary hearing and

argument by counsel, the circuit court suppressed both statements, holding that Giampa's Fifth

Amendment rights were violated.[1] The Commonwealth appealed.

BACKGROUND

When considering on appeal the trial court's grant of a motion to suppress, we must view

the evidence in the light most favorable to Giampa, the prevailing party below, and grant him all

reasonable inferences fairly deducible from that evidence. *Sidney v. Commonwealth*, 280 Va. 517,

520 (2010); *Commonwealth v. Grimstead*, 12 Va. App. 1066, 1067 (1991).

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] The trial court rejected Giampa's claim that his statements were not made voluntarily.

On December 22, 2017, Detective Craig Guyton of the Fairfax County Police reported to the scene of the double homicide of Scott Fricker and Buckley Kuhn Fricker. Also at the scene was 17-year-old Giampa, who had suffered a self-inflicted gunshot wound to the head, and the Frickers' daughter and Giampa's former girlfriend, A.F., who was uninjured. Giampa experienced a traumatic brain injury; he was transported to Reston Hospital where he underwent emergency brain surgery and was put in a medically induced coma, which was maintained until the end of the first week of January.

On January 16, 2018, Detective Guyton and his partner went to Reston Hospital to interview Giampa. Giampa had been kept under continuous police guard and shackled to his hospital bed by his ankle and wrist. Detective Guyton commenced the interview by reading Giampa his *Miranda* rights from a standard form he carried. He then "directed [Giampa] to read to himself the consent to speak . . . then [Giampa was] directed to sign it." Detective Guyton did not confirm Giampa's understanding of each of his rights, and Giampa signed the waiver without asking any clarifying questions. The interview on January 16 lasted approximately 45 minutes and was audio recorded.

During the interview, Giampa made numerous incriminating statements, some factually accurate and others demonstrably false. Giampa described inflicting injuries on the victims which were consistent with those actually sustained. However, he also incorrectly told Detective Guyton that he "shot and killed five people and specifically believe[d] that he killed . . . the decedents' youngest son." Giampa also "did not know his own father's name . . . until prompted. He [did] not know his long-time former girlfriend's name and" throughout the interview "call[ed] her a completely different name." He incorrectly recalled that his girlfriend "shot herself" and at one point referenced his own incoherence, explaining, "my brain is half asleep."

Detective Guyton and his partner returned to the hospital the following day to re-interview Giampa. Using slightly different language, Detective Guyton "advised [Giampa] of his rights by

- 2 -

them being read at about the same pace [as the day before] without inquiry as to whether or not he understood each right." Then, Detective Guyton read Giampa "the consent to speak after confusing the process briefly."[2] As with the day before, "there . . . was no follow up as to whether or not [Giampa] comprehended and appreciated the rights that he was waiving." During the January 17 interview, Giampa was able to accurately describe how to unlock the door to the Fricker home, as well as the weapon used to shoot the Frickers; however, he also remained confused about several facts, including maintaining his belief that he had killed the Frickers' son.

Elizabeth Kurt, a nurse practitioner in the ICU at Reston Hospital who was responsible for Giampa's care on January 16 and 17, 2018, testified at the suppression hearing. Nurse Kurt testified that when she conducted rounds on January 16, 2018, she observed Giampa handcuffed to his hospital bed with police officers at his bedside. She testified that Giampa was "awake," meaning "he was laying in the bed, his eyes were open. He was looking around the room." And he was "alert" meaning "he did not doze off, he was able to watch [her] walk around the room, look appropriately around. Did not fall asleep during conversations or anything." Giampa was capable of answering simple questions, able to "mov[e] all of his extremities," and "denied having pain." On both January 16 and 17, Giampa was "oriented times three," meaning he was oriented to "person, place and time." Nurse Kurt noted nothing about Giampa's speech on those days and testified that he was "very stable" and was considered lower acuity. Although she testified that Giampa showed no signs of distress on the 17th, Nurse Kurt acknowledged on cross-examination that he was "agitated" on that day and used explicit language toward her. "[T]he only pain medication [Giampa] was on" on January 16 and 17 was "over-the-counter, acetaminophen."

---

[2] As Dr. Jeffry Aaron pointed out in his report, discussed in greater detail *infra* on page five, when reading Giampa his rights on January 17, Detective Guyton "shifted from the second person ('You know what your rights are . . .') to the first person ('I know what my rights are . . .')." Such a shift "could easily have magnified the challenges for someone who was already struggling to understand the implications of the warnings."

Following his arrest, the juvenile and domestic relations district court ordered Giampa to undergo a competency evaluation and he was found not competent to stand trial. In conjunction with his competency evaluation and subsequent restoration services, Giampa saw Dr. William Ling, a clinical psychologist, in May of 2018 for a "neuropsychological evaluation." Dr. Ling met with Giampa for testing over the course of five to six hours at the Juvenile Detention Center. Based on his evaluation, Dr. Ling testified at the suppression hearing that his "testing data suggested that after the gunshot wound Mr. Giampa demonstrated a significant decline in his verbal cognitive abilities. A more significant decline was noted with regard to his relative efficiency." Dr. Ling further noted that Giampa suffered difficulties in motor function, language function, impulse control, and mental flexibility.

At the time of testing, Giampa had an overall IQ score of 64, which is "in the deficient range" and "suggested severe impairment" and "at an overall level his cognitive function was severely impaired." During his evaluation with Dr. Ling, Giampa "was having significant difficulty sequencing the information appropriately. He'd get lost, he'd get overwhelmed, he'd get confused. And that was reflected in his output." Noting that Giampa had "difficulty with the efficiency of his processing overall," Dr. Ling explained that "it affects both what the individual would understand from someone asking questions . . . . [I]t's rather like having a cell phone conversation with someone who has bad signal, which means that . . . different pieces of the information are understood and they will be responded to."

Regarding Giampa's psychological function, Dr. Ling opined that "[h]is cognitive impairments undercuts the capacity of Mr. Giampa to think through difficulties and problems resulting in markedly restricted engagement." The testing data showed Giampa's reading comprehension at a fourth or fifth grade level and suggested that he "had a fundamental difficulty with the accuracy and consistency of his understanding, his cognitive understanding of information

and situations," making him prone to confusion "in the moment." Finally, Dr. Ling opined that Giampa's functioning would have been worse at the time of the interviews in January 2018 than at the time of testing in May 2018.

Giampa ultimately underwent restoration services, but in a November 2018 post-restoration evaluation, which was considered by the court in ruling on the motion to suppress, forensic evaluator Dr. Lynne Hahnemann found that Giampa suffered "cognitive impairment" and "did not demonstrate the ability to understand the proceedings against him." Moreover, despite having received restoration services, Giampa's "performance on this [post-restoration] evaluation . . . declined from his previous assessment."

Dr. Jeffrey Aaron, a clinical and forensic psychologist, met with Giampa to conduct a forensic psychological evaluation in October of 2020. Dr. Aaron also listened to Giampa's police interviews and looked at Giampa's "functioning both before and after the brain injury." Dr. Aaron concluded that the traumatic brain injury "affected [Giampa's] cognitive functioning and his information processing" and that in January 2018, when he was interviewed by Detective Guyton, Giampa's "cognitive functioning" was "[e]xceedingly impaired." The *Miranda* warnings given by Detective Guyton to Giampa was about "240 words per minute," and Detective Guyton did not pause between each right to check for Giampa's comprehension. Dr. Aaron testified that he believes Giampa to have autism spectrum disorder and opined that someone with a traumatic brain injury, autism, anxiety, and adolescent development would hear the detective's instruction to read and sign the consent to speak "as a directive." Considering the recorded police interviews, Dr. Aaron testified that Giampa "would say yes to most things that were suggested to him, even when they were inconsistent with what he had just said, and that he wasn't tracking sufficiently to note when what he had said had been changed." He opined that Giampa's "ability to understand [the *Miranda* warnings] and not merely understand them, but appreciate them was exceedingly impaired."

The court also heard the testimony of Dr. Carolyn Corbett, a licensed psychologist who evaluated Giampa in October of 2017, *before* the shootings and resultant traumatic brain injury. Dr. Corbett noted in her report that even in 2017 Giampa's "judgment was extremely impaired," he had "average cognitive functioning," was "clinically depressed," and "very angry and paranoid." She diagnosed him with "dysthymic disorder, which is long term depression." She did not diagnose him with any personality disorders "because you can't give that to someone who is less than 18." At the time, Dr. Corbett had recommended in-patient treatment.

After considering the evidence and arguments of counsel, the circuit court granted the motion to suppress, holding that "the Commonwealth failed to establish by a preponderance of the evidence that [Giampa] knowingly and intelligently waived his *Miranda* rights under the specific facts of this case based upon a totality of the circumstances in that analysis." The Commonwealth appealed.

ANALYSIS

The Fifth and Sixth Amendments to the United States Constitution require that "[a] suspect must knowingly and intelligently waive his rights against self-incrimination and to the assistance of legal counsel in order for a confession made during a custodial interrogation to be admissible in evidence against him." *Rodriguez v. Commonwealth*, 40 Va. App. 144, 155 (2003). At a hearing on a motion to suppress, the burden is on the Commonwealth to "prove by a preponderance of the evidence . . . that the accused knowingly, intelligently and voluntarily waived his *Miranda* rights." *Id.* at 155. The Commonwealth challenges on appeal the trial court's finding that Giampa's waiver of his *Miranda* rights was not knowingly and intelligently made. This is "a question of fact, and the trial court's resolution of that question is entitled on appeal to the presumption of correctness." *Harrison v. Commonwealth*, 244 Va. 576, 581 (1992). When reviewing a trial court's ruling on a motion to suppress, "we are bound by the trial court's findings of historical fact unless 'plainly

- 6 -

wrong' or without evidence to support them." *McGee v. Commonwealth*, 25 Va. App. 193, 198 (1997) (en banc). We review the application of the law to those facts de novo. *Jones v. Commonwealth*, 71 Va. App. 375, 380 (2019).

Evaluating whether a juvenile defendant has made a knowing and intelligent waiver of his rights "includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

In this case, although Giampa was a 17-year-old high school senior with prior contact with the criminal justice system, he had recently to his police interviews suffered a traumatic brain injury which severely impacted his cognitive functioning, including his "capacity to understand the [*Miranda*] warnings given him." *Id.* In so holding, the court made numerous factual findings in support of this conclusion. Specifically, that:

> as a result of [Giampa's] recent traumatic brain injury and its consequential effects on his capacity, in conjunction with his age, his psychological vulnerabilities of what was testified to as to autism spectrum disorder or certainly a rule out of autism spectrum disorder and major depressive disorder and the manner and circumstances of how his rights were advised to him on both January 16th and 17th, that the Commonwealth failed to establish by a preponderance of the evidence that the Defendant appreciated and understood the rights that he was purportedly waived.

The court expressly found Drs. Ling and Aaron, "as well as the conclusions of Dr. Hahnemann," and "the other psychological testimony, compelling and credible." It credited Dr. Ling's conclusion that Giampa was "improving in May," when he was interviewed by Dr. Ling, "as compared to where he was in January," when interviewed by Detective Guyton. It further "dr[ew] reasonable inferences that [Giampa's deficits] w[ere] more severe at the time of [Dr. Aaron's] evaluation than [they were] in . . . January of 2018."

The court found that Giampa "was deficient to borderline range in cognitive function as a result of the brain injury. He was moderate to severe in limitations in capacity to ingest, analyze and respond. His speed of visual analysis and processing was in the deficient range." The court held that Giampa's "oral comprehension is within the deficit range as a result of the injury to the part of his brain that regulates language and function, . . . he has an IQ of approximately 64, reads on a fifth-grade level, and there was no real competent evidence to the contrary." The trial judge described Giampa as a "17-year-old juvenile with an established history of major depressive disorder with either autism spectrum disorder or a rule out of autism spectrum disorder and paranoia."

Considering Giampa's physical condition at the time of the police interviews, the court concluded:

> He was in the hospital with a traumatic brain injury caused by a December 17, 2017, self-inflicted gunshot wound to the head, with the bullet entering the skull at the center of his forehead, . . . and passing through his brain from the left frontal sinus through the left frontal parietal calvarium, which is the frontal lobe, and [exiting] above the left ear. There was also multiple residual fragments in the left frontal lobe. A portion of his skull was removed due to the skull fragments and swelling, a coma was induced until the end of the first week of January 2018.

Further, although there were times when Giampa was "oriented times three, . . . no doctor performed any sort of neurological or cognitive capacity assessment, nor where they asked to do so." Notwithstanding Nurse Kurt's testimony that she did not make any note of Giampa's speech on the 16th, "as recently as January 15th, 2018, the notes reflect, . . . '[t]hat the patient presents with cognitive linguistic deficits related to executive functioning, verbal fluency and attention, and visual special skills.'"

Moving to the audio recordings of the interviews[3] themselves, the court found that they "show a consistency in halting, strained and materially inconsistent statements, indicating a lack of awareness or appreciation of the rights that he was waiving." Specifically, the court referenced Giampa's mistaken belief that he "shot and killed five people," including "the decedents' youngest son," his statement at one point during the interview that his girlfriend "shot herself," and that he "did not know his own father's name . . . until prompted" and did "not know his long-time former girlfriend's name and call[ed] her a completely different name." The court noted Giampa's statement during one interview that his "brain is half asleep" and found that he was "incomprehensible at times regarding confusion of the principle with the nurse when discussing a suicide pact. He is inaccurate beyond just going to the weight of the evidence regarding when he last saw his girlfriend."

When considering Giampa's ability to knowingly and intelligently comprehend his *Miranda* rights, the trial court gave weight to the speed at which Detective Guyton read them to Giampa, as well as Detective Guyton's failure to confirm that Giampa understood those rights. The court further gave significant weight to Dr. Aaron's conclusion that Giampa "had long-standing social comprehension deficits that were exacerbated by his traumatic brain injury and call into question the appreciation of his rights that he was waiving." "[T]he cognitive confusion that was evident in the interview," the court continued, "went well beyond an accused denying certain things in a self-serving manner."

---

[3] We have previously held that "we, on appellate review, view video evidence not to determine what we think happened, but for the limited purpose of determining whether any rational factfinder could have viewed it as the trial court did." *Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022). The logic underlying that deference, which "stems not from the trial court being in a superior position to view the video evidence but from the difference in our respective roles," extends equally to our consideration of audio recordings, such as in this case.

Rejecting the Commonwealth's suggestion to presume a waiver, the court "specifically reject[ed] the notion . . . that there has to be direct evidence . . . either from [Giampa] or someone else that he didn't understand what was taking place." The trial court remarked that Dr. Hahnemann's "conclusion that [Giampa] was not competent to stand trial because he did not understand the pleadings against him or was unable to assist his defense is not controlling . . . but indicates the level of deficit that existed in this case prior to him being restored to competency."

Then focusing its analysis on the specific manner of advisement of rights, the court summarized: in the interview on January 16, Giampa was read his *Miranda* rights, "then he's directed to read to himself the consent to speak without any inquiry as to whether or not they were read out loud or otherwise, which is significant on the waiver issue in this case, and then he's directed to sign it." In the interview on January 17,

> [h]e's advised of his rights by them being read at about the same pace without inquiry as to whether or not he understood each right, which is not essential by any stretch of the imagination on a typical case, *but I want the record to reflect that it is essential on this case given the nature of his vulnerabilities and his injury.*

(Emphasis added). Then, "the police officer reads the consent to speak after confusing the process briefly." The court continued:

> He's then asked, "Can you read and see that stuff there?" in which there is an inaudible basic grunt on the January 17th tape, which the Court for purposes of this hearing will conclude is a yes. That still does not suffice to say that he understands those rights and he understands the rights that he is waiving. And there simply was no follow up as to whether or not he comprehended and appreciated the rights that he was waiving in this case.

Although the law does not require police to use a specific manner to advise an accused of his rights under *Miranda*, the trial court concluded that:

> under the facts of this case with a physically and psychologically compromised juvenile patient, the Court concludes more proof was necessary for the Court to conclude that the Commonwealth met its burden by a preponderance of the evidence that there was a knowing

and intelligent waiver in that he appreciated his rights and appreciated the waiving of them.

Although the Commonwealth points to a number of cases in which injured or cognitively impaired individuals were found to have knowingly and intelligently waived their *Miranda* rights, *see e.g.*, *Eaton v. Commonwealth*, 240 Va. 236 (1990); *Cornell v. Commonwealth*, 232 Va. 454 (1987); *Simpson v. Commonwealth*, 227 Va. 557 (1984); *United States v. Robinson*, 404 F.3d 850 (4th Cir. 2005); *United States v. Cristobal*, 293 F.3d 134 (4th Cir. 2002); *United States v. Glover*, 596 F.2d 857 (9th Cir. 1979), such a conclusion is based on the totality of the circumstances of the individual case and "will not be disturbed on appeal unless plainly wrong;" *Harrison*, 244 Va. at 581. Giving deference to the trial court's extensive factual findings regarding Giampa's physical condition, his cognitive abilities, and the manner in which his rights were presented, we cannot say that the court's holdings were plainly wrong or without evidence to support them. The trial court, therefore, did not err in holding that the Commonwealth failed to prove by a preponderance of the evidence that Giampa knowingly and intelligently waived his *Miranda* rights.[4]

---

[4] The Commonwealth separately assigns error to what it alleges is the trial court's imposition of a specific and elevated manner of *Miranda* warnings advisement. Specifically, the trial court noted that (1) in the January 16 interview, Giampa was "directed to read himself the consent to speak without any inquiry as to whether or not [the warnings] were read out loud or otherwise," which the court found "significant on the waiver issue in this case"; and (2) in the January 17 interview, despite Detective Guyton reading Giampa the consent to speak and Giampa's verbal confirmation that he understood, the trial court found "there was simply no follow up as to whether or not he comprehended and appreciated the rights that he was waiving in this case." The Commonwealth suggests that these concerns highlighted by the trial court constituted "*additional* requirements" in *Miranda* warning procedures.
We find that the trial court did not apply a heightened standard. The court did not suggest that the content of Detective Guyton's *Miranda* warnings was insufficient. Instead, the court expressly recognized that it was "well aware that the law doesn't require any special sequence or manner of advisement of rights or a waiver." *Contra Duckworth v. Eagan*, 492 U.S. 195, 203 (1989); *California v. Prysock*, 453 U.S. 355, 361 (1981) (per curiam). The court simply concluded that the Commonwealth failed to show that Giampa knowingly and intelligently waived his *Miranda* rights based on the totality of the circumstances—the proper standard for analyzing an alleged *Miranda* waiver.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court suppressing Giampa's statements as given in violation of his Fifth Amendment rights is affirmed.

*Affirmed.*

Beales, J., concurring in the judgment.

I concur that we must affirm the trial court given the deferential standard of review that we must use here. *See Watkins v. Commonwealth*, 229 Va. 469, 477 (1985). As the majority notes, Giampa was a minor at the time he was questioned by the detectives. He had been in a coma for over two weeks after undergoing extensive neurosurgery for a traumatic brain injury. At the time of the two interviews, he had emerged from that coma only days earlier, he still had three holes in his head, he actually told the detectives, "half my brain is sleeping," and, as the trial court found as a finding of fact, he had "significant impairment of cognitive function."

Giampa's mother also testified that she was often at the hospital with her son as she generally visited her son three times a day. She further testified that she had taped a large note above Giampa's hospital bed informing everyone, including the police who were present and guarding him 24-7, that her son was not to talk to anyone except his parents or his attorney. In addition, she had attached the attorney's business card (with his name and phone number) to that note. Despite being aware of the note from Giampa's mother and having seen Giampa's attorney's business card, the detectives did not call or contact either parent or Giampa's attorney before beginning their questioning. Instead, the detectives (who understandably had been coordinating a 24-hour police guard of Giampa and a daily log recording Giampa's status and the visitors he received) chose to interview Giampa at a time when neither his mother, his father, nor his attorney was present. Furthermore, despite Giampa's unique mental state of having three holes in his head and having just recently emerged from a coma, the detectives quickly read the recovering 17-year-old Giampa his *Miranda* rights and then directed him to sign the *Miranda* waiver form.

Given the specific circumstances of this particular case, including the traumatic brain injury (albeit self-inflicted after the two horrific killings), the resulting coma from which Giampa

had only recently emerged, and his mother's written instructions next to Giampa's attorney's card taped above his bed that Giampa (a minor) was "only [to] speak to [his] attorney and [his] parents," I cannot say the trial court's decision was error. Indeed, the trial court's finding, based on a totality of the circumstances analysis, that Giampa did not knowingly and intelligently waive his *Miranda* rights is, as the Supreme Court has required, "entitled on appeal to a presumption of correctness" and "will not be disturbed on appeal unless plainly wrong." *Harrison v. Commonwealth*, 244 Va. 576, 581 (1992). Consequently, for all these reasons, given the totality of the specific circumstances in this particular case, I concur in the judgment of this Court affirming the circuit court.